<pre>
                    THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF CALIFORNIA


                    HONORABLE JANIS L. SAMMARTINO
                 UNITED STATES DISTRICT JUDGE PRESIDING


    _____


    UNITED STATES OF AMERICA,      )
                                   )
                    PLAINTIFF,     )   NO. 13-CR-2297-JLS
                                   )
    VS.                            )   SENTENCING HEARING
                                   )
    TONY LEE MCLEOD,               )   JANUARY 6, 2016
                                   )
                    DEFENDANT.     )


    _____



    APPEARANCES:



    FOR THE PLAINTIFF:        DAVID LESHNER
                              CHARLOTTE KAISER
                              U.S. ATTORNEY'S OFFICE
                              SOUTHERN DIST. OF CALIFORNIA
                              CRIMINAL DIVISION
                              880 FRONT STREET, SUITE 6293
                              SAN DIEGO, CA  92101



    FOR THE DEFENDANT:        LEILA MORGAN
                              FEDERAL DEFENDERS OF SAN DIEGO
                              225 BROADWAY, SUITE 900
                              SAN DIEGO, CA  92101-5008




    THE COURT REPORTER:       GAYLE WAKEFIELD, RPR, CRR
                              WAKEFIELDGAYLE@GMAIL.COM
</pre>

1    JANUARY 6, 2016

2                          MORNING SESSION

3         THE CLERK:  NUMBER ONE ON THE CALENDAR, 13-CR-2297,

4    UNITED STATES OF AMERICA VS. TONY LEE MCLEOD, FOR SENTENCING.

5         MS. KAISER:  GOOD MORNING, YOUR HONOR, CHARLOTTE KAISER

6    AND DAVID LESHNER ON BEHALF OF THE UNITED STATES.

7         MS. MORGAN:  GOOD MORNING, YOUR HONOR, LEILA MORGAN,

8    FEDERAL DEFENDERS, ON BEHALF OF MR. MCLEOD, WHO IS PRESENT IN

9    CUSTODY.

10        THE COURT:  THANK YOU.

11        THE COURT HAS READ AND CONSIDERED THE FOLLOWING

12   DOCUMENTS FOR PURPOSES OF SENTENCING THIS MORNING.  I HAVE THE

13   PRESENTENCE REPORT.  I HAVE THE ADDENDUM TO THE PRESENTENCE

14   REPORT.  I HAVE THE DEFENDANT'S SENTENCING MEMORANDUM, WHICH

15   HAS ATTACHED TO IT NUMEROUS LETTERS FROM FAMILY.  I HAVE OTHER

16   DOCUMENTS IN SUPPORT.  I HAVE THE OBJECTIONS TO THE PRESENTENCE

17   REPORT BY THE DEFENSE TO THE PRESENTENCE REPORT, AND I HAVE THE

18   OBJECTIONS TO DR. KALISH'S REPORT THAT HAS BEEN PRESENTED TO

19   THE COURT.  THOSE OBJECTIONS HAVING BEEN PREVIOUSLY RESOLVED BY

20   THE COURT.

21        FROM THE GOVERNMENT I HAVE THE FOLLOWING DOCUMENTS:  I

22   HAVE THE GOVERNMENT'S SENTENCING MEMORANDUM.  THE GOVERNMENT'S

23   SENTENCING SUMMARY CHART.  THE RESPONSE TO THE PSR OBJECTIONS.

24   THE EXHIBITS IN SUPPORT OF THE SENTENCING MEMORANDUM AND

25   RESPONSE TO OBJECTIONS.  I HAVE THE REPORT BY DR. KALISH.  I

HAVE VICTIM IMPACT STATEMENTS.  I HAVE RESPONSES TO THE

OBJECTIONS TO THE REPORT OF DR. KALISH.

        THE COURT PRESIDED OVER A LENGTHY TRIAL IN THIS MATTER

AND --

        MS. MORGAN:  YOUR HONOR, I DON'T MEAN TO INTERRUPT, BUT

WE DID FILE UNDER SEAL THE REPORT OF DR. CLIPSON.

        THE COURT:  I BELIEVE IT'S ATTACHED.  I HAVE READ DR.

CLIPSON'S REPORT.  I CAN TELL YOU WHAT IT'S ATTACHED TO.

        MS. MORGAN:  I BELIEVE IT WAS ATTACHED TO OUR MEMO.

YOU MENTIONED "NUMEROUS ATTACHMENTS," I JUST WANTED TO MAKE

SURE IT WAS IN THERE.

        THE COURT:  NO, IT IS IN HERE.  I'M LOOKING FOR WHAT

DOCUMENT IT'S ATTACHED TO.  NO, I DO HAVE THAT DOCUMENT, OF

COURSE.

        MS. MORGAN:  THANK YOU, YOUR HONOR.  I DIDN'T MEAN TO

INTERRUPT.

        THE COURT:  AS I INDICATED, I PRESIDED OVER THE TRIAL

IN THIS MATTER, AND I HAVE SPENT CONSIDERABLE TIME GOING

THROUGH ALL THE DOCUMENTS THAT HAVE BEEN PRESENTED IN THIS

MATTER, AND I'M GOING TO ADDRESS AT THIS POINT THE COURT'S

VIEWS ON MANY OF THE OBJECTIONS THAT HAVE BEEN RAISED.  I WILL

FOLLOW THE PATTERN THAT I NORMALLY FOLLOW IN SENTENCINGS; I

WILL HEAR FROM THE DEFENSE, AND THE DEFENDANT HAS AN

OPPORTUNITY.  AS I HAVE ALSO ALREADY RULED, IF THERE'S ANYBODY

ELSE WHO WISHES TO BRIEFLY ADDRESS THE COURT ON BEHALF OF THE

DEFENDANT, THEY MAY.  I'LL TURN TO THE GOVERNMENT, AND ANYBODY WHO WOULD LIKE TO ADDRESS THE COURT CERTAINLY MAY ON BEHALF OF THE VICTIMS IN THIS CASE.  I'LL TURN TO PROBATION, IF THERE'S ANYTHING TO ADD.

THE DEFENDANT HAS RAISED NUMEROUS FACTUAL OBJECTIONS TO THE PRESENTENCE REPORT.  THE COURT WILL PERMIT A BRIEF OPPORTUNITY FOR THE DEFENDANT TO RESPOND, BUT THE COURT IS THUS FAR PERSUADED THAT THE CONTESTED INFORMATION BEARS SUFFICIENT INDICIA OF RELIABILITY TO WARRANT INCLUSION IN THE PRESENTENCE REPORT.  THE COURT NOTES THAT IN SOME INSTANCES DEFENDANT'S CLARIFICATIONS ARE SET FORTH IN THE ADDENDUM TO THE PRESENTENCE REPORT.  THE COURT IS NOT PERSUADED THAT ANY OF THE DISPUTED INFORMATION IS UNRELIABLE OR INACCURATE.

AS TO DEFENDANT'S LEGAL OBJECTIONS TO THE PRESENTENCE REPORT, THE COURT FINDS THAT THE GUIDELINE CALCULATIONS SET FORTH IN THE PRESENTENCE REPORT ARE CORRECT, WITH THE EXCEPTION OF THE MULTIPLE-COUNT ADJUSTMENT WHICH SHOULD BE INCREASED -- SHOULD BE AN INCREASE OF FIVE LEVELS UNDER SECTION 3D1.4 AS SET FORTH IN THE ADDENDUM TO THE PRESENTENCE REPORT.

THE COURT DISAGREES WITH DEFENDANT'S POSITION THAT COUNTS 2 THROUGH 9 SHOULD BE GROUPED TOGETHER UNDER SENTENCING GUIDELINE SECTION 3D1.2(B).  SECTION 3D1.2(B) PRECLUDES THE GROUPING OF OFFENSES THAT CANNOT BE CONSIDERED TO REPRESENT ESSENTIALLY ONE COMPOSITE HARM.  THE RELEVANT APPLICATION NOTE GIVES THE EXAMPLE THAT ROBBERY OF THE SAME VICTIM ON DIFFERENT

1    OCCASIONS INVOLVES MULTIPLE, SEPARATE INSTANCES OF FEAR AND

2    RISK OF HARM, NOT ONE COMPOSITE HARM.

3         COUNTS 2 THROUGH 9 OF THE INDICTMENT SIMILARLY INVOLVED

4    INDEPENDENT INSTANCES OF CONDUCT, EACH RESULTING IN A SEPARATE

5    AND DISTINCT HARM TO THE VICTIM; THEREFORE, GROUPING, PURSUANT

6    TO SECTION 3D1.2(B), IS NOT APPROPRIATE.  HOWEVER, THE COURT

7    WILL MAKE ALTERNATIVE SENTENCING CALCULATIONS WITH RESPECT TO

8    THIS OBJECTION.

9         THE COURT ALSO DISAGREES WITH DEFENDANT'S POSITION THAT

10   THE UNITED STATES SENTENCING GUIDELINES SECTION 2G1.3(B)(2)(B),

11   ENHANCEMENT FOR UNDUE INFLUENCE, SHOULD NOT APPLY TO COUNTS 10

12   AND 11.  AS THE GOVERNMENT POINTS OUT, THERE IS A REBUTTABLE

13   PRESUMPTION THAT THE ENHANCEMENT WILL APPLY WHEN THE AGE

14   DIFFERENCE BETWEEN THE DEFENDANT AND THE MINOR EXCEEDS

15   10 YEARS.  FURTHERMORE, THE EVIDENCE PRESENTED AT TRIAL FULLY

16   SUPPORTS THE ENHANCEMENT.

17        THE COURT ALSO CONCLUDES THAT THE SEXUAL CONTACT

18   ENHANCEMENT OF SENTENCING GUIDELINE SECTION 2G1.3(B)(4)(A) IS

19   APPLICABLE TO COUNTS 10 AND 11.  ALTHOUGH DEFENDANT DISPUTES

20   THE SEXUAL CONTACT BETWEEN DEFENDANT AND MINOR VICTIM NUMBER 1,

21   THE JURY CLEARLY CREDITED THE TESTIMONY OF MINOR VICTIM NUMBER

22   1; THUS, THE COURT FINDS THE ENHANCEMENT TO BE APPROPRIATE.

23   ACCORDINGLY, ALL OF DEFENDANT'S LEGAL OBJECTIONS TO THE

24   PRESENTENCE REPORT ARE OVERRULED.

25        FINALLY, WITH RESPECT TO CONDITIONS OF SUPERVISED

RELEASE, THE COURT IS INCLINED TO IMPOSE THE CONDITIONS RECOMMENDED IN THE PRESENTENCE REPORT WITH THE ADDITIONAL CHANGES RECOMMENDED BY THE GOVERNMENT.  THUS, THE COURT IS INCLINED TO IMPOSE CONDITIONS 2, 3, 4, 5 AND 6 AS SET FORTH IN THE PRESENTENCE REPORT.

CONDITION NUMBER 7 WOULD BE AMENDED TO PROHIBIT LOITERING NEAR PLACES PRIMARILY FREQUENTED BY MINORS.

CONDITION NUMBER 8 WOULD READ, "NOT POSSESS ANY MATERIALS SUCH AS VIDEOS, MAGAZINES, PHOTOGRAPHS, COMPUTER IMAGES OR OTHER MATTER THAT DEPICTS SEXUALLY-EXPLICIT CONDUCT INVOLVING CHILDREN," AS DEFINED BY TITLE 18 UNITED STATES CODE 2256(2), "ACTUAL SEXUALLY-EXPLICIT CONDUCT INVOLVING ADULTS," AS DEFINED BY 18 UNITED STATES CODE 2257(H)(1), "AND NOT PATRONIZE ANY PLACE WHERE SUCH MATERIAL OR ENTERTAINMENT ARE THE PRIMARY MATERIAL OR ENTERTAINMENT AVAILABLE."

CONDITION NUMBER 9 WOULD BE MODIFIED TO INCLUDE "PHYSIOLOGICAL TESTING, WITH THE EXCEPTION OF PENILE PLETHYSMOGRAPH TESTING."

WITH REGARD TO THE GUIDELINE CALCULATION, GROUPS 1 THROUGH 8, WHICH ARE COUNTS 2 THROUGH 9, WHICH WERE SEXUAL EXPLOITATION OF A CHILD AND ATTEMPTED SEXUAL EXPLOITATION OF A CHILD WITH REGARD TO VICTIM NUMBER 1, THE BASE OFFENSE LEVEL WOULD BE A 32.  BECAUSE OF MINORS BETWEEN THE AGE OF 12 AND 16 A PLUS 2 IS ADDED.  BECAUSE OF THE USE OF A COMPUTER, ANOTHER PLUS 2, SO THE ADJUSTED OFFENSE LEVEL BECOMES A 36.

WITH REGARD TO GROUP 9, WHICH IS COUNTS 10 AND 11, WHICH WERE TRAVEL WITH INTENT TO ENGAGE IN ILLICIT SEXUAL CONDUCT AND TRANSPORTATION OF A MINOR, THE BASE OFFENSE LEVEL WOULD BE A 28. THE UNDUE INFLUENCE WOULD ADD A PLUS 2. THE USE OF COMPUTER -- OF A COMPUTER WOULD BE ANOTHER PLUS 2, AND THE COMMISSION OF A SEXUAL ACT WOULD INCLUDE A PLUS 2, RESULTING IN AN ADJUSTED OFFENSE LEVEL OF 34.

GROUP 10, WHICH IS REFERRING TO COUNT 13, WHICH WAS THE ATTEMPTED SEXUAL EXPLOITATION OF A CHILD WITH REGARD TO VICTIM NUMBER 2, THE BASE OFFENSE LEVEL IS A 32, WITH A PLUS 2 ADDED BECAUSE OF A MINOR BETWEEN THE AGES OF 12 AND 16 YEARS, ANOTHER PLUS 2 BECAUSE OF USE OF A COMPUTER, SO THE RESULTING ADJUSTED OFFENSE LEVEL IS A 36.

SO ADDRESSING THE MULTIPLE-COUNT ADJUSTMENT, THE TOTAL NUMBER OF UNITS, ONE FOR EACH GROUP ABOVE, WOULD BE A 10, RESULTING IN A PLUS 5 INCREASE IN OFFENSE LEVEL OVER THE GREATER OF THE ADJUSTED OFFENSE LEVELS ABOVE 36, RESULTING IN A LEVEL 41 AND A GUIDELINE RANGE OF 324 TO 405 MONTHS.

NOW, I'VE INDICATED THAT I WOULD MAKE AN ALTERNATIVE GUIDELINE CALCULATION. IF COUNTS 2 THROUGH 9 ARE PROPERLY GROUPED PURSUANT TO GUIDELINE SECTION 3D1.2(B), THE TOTAL NUMBER OF UNITS PURSUANT TO THAT SECTION WOULD BE THREE, AND THE RESULT WOULD BE A PLUS 3 INCREASE IN OFFENSE LEVEL OVER THE GREATER OF THE ADJUSTED OFFENSE LEVELS, WHICH IS 36, SO THE TOTAL OFFENSE LEVEL WOULD THEN BE A 39, WITH A GUIDELINE RANGE

OF 262 MONTHS TO 327 MONTHS, AND I SAID THAT I WOULD MAKE AN
ALTERNATIVE CALCULATION.

WITH REGARD TO RESTITUTION, THE STATE OF THE
INFORMATION THAT I HAVE DOES NOT SET FORTH SUFFICIENTLY
INFORMATION FOR ME TO PROCEED ON THAT TODAY, SO I'M THINKING
THAT WHAT WE SHOULD DO IS DEAL WITH SENTENCING AND THEN PUT
OVER ANY REQUEST FOR RESTITUTION FOR 45 DAYS OR HOWEVER MUCH
TIME THE PARTIES NEED.  WE CAN TAKE THAT UP AT THE END, BUT I
WOULD LIKE AN ACCOUNTING OF WHAT IS BEING REQUESTED, GIVE THE
DEFENSE AN OPPORTUNITY TO OBJECT, IF THERE'S ANY OBJECTION, AND
REQUEST A HEARING BEFORE THE COURT RULES ON THAT.  I THINK
THAT'S WHAT WE SHOULD APPROPRIATELY DO THERE.

SO I KNOW THAT'S A LOT TO HEAR ALL AT ONE TIME,
COUNSEL, MS. MORGAN, BUT THOSE ARE THE COURT'S THOUGHTS AT THIS
TIME, AND I'LL TURN TO YOU NOW, MA'AM, FOR ANY COMMENTS YOU
WOULD LIKE TO MAKE.

MS. MORGAN:  CERTAINLY, YOUR HONOR.  I'M GOING TO START
WITH THINGS THAT I ABSOLUTELY AGREE WITH YOU ON, WHICH IS THE
BIFURCATION OR THE SEPARATE HEARING FOR RESTITUTION.  MS.
KAISER AND I HAVE HAD A CHANCE TO MEET AND CONFER.  WE ALL
AGREE THERE'S NOT SUFFICIENT DOCUMENTATION, SO WE'LL GET THAT
OUT OF THE WAY.

IN TERMS OF THE GUIDELINES DISPUTE, I STAND BY OUR
LEGAL OBJECTIONS TO THE PRESENTENCE REPORT.  I UNDERSTAND THE
COURT HAS READ AND CONSIDERED EVERYTHING.  I DO THINK THAT I'VE

SUFFICIENTLY SET OUT OUR POSITIONS IN THE BRIEFING IN TERMS OF
WHY WE DON'T BELIEVE CERTAIN ENHANCEMENTS SHOULD APPLY IN TERMS
OF THE UNDUE INFLUENCE, AND WHATNOT, AND WE'LL REST ON THOSE
SUBMISSIONS.  WE DO STAND BY OUR GROUPING CALCULATIONS AND THAT
GROUPS 2 THROUGH 9 SHOULD PROPERLY GROUP, BUT WE'LL SUBMIT ON
OUR PAPERS AS TO THOSE LEGAL OBJECTIONS.

THE COURT:  AND I WILL MAKE THOSE CALCULATIONS.

MS. MORGAN:  THE COURT'S INDICATED THAT.  I THINK THOSE
ISSUES ARE PROPERLY PRESERVED, AND SO FOR THAT WE'LL SUBMIT ON
OUR PAPERS FOR THE LEGAL POSITIONS ON THOSE.

INSOFAR AS THE FACTUAL DISPUTES, I THINK PRIMARILY OUR
CONCERNS, SOME OF WHICH WERE ADDRESSED IN THE PROBATION
OFFICER'S ADDENDUM TO THE PRESENTENCE REPORT IN MAKING THE
CLARIFICATIONS THAT WE REQUESTED AND EXPLAINING -- AND ADDING
ADDITIONAL INFORMATION THAT THEY DIDN'T HAVE.

I KNOW THE COURT PRESIDED OVER THE HEARING -- OR THE
TRIAL, AND THE COURT HAS ALL OF THE INFORMATION IN FRONT OF IT.
OUR REQUEST THAT SOME OF THE INFORMATION BE STRICKEN IS IN
LARGE PART DUE TO THE AFFECT THAT SOME OF THIS INFORMATION CAN
HAVE ON MR. MCLEOD IN THE BUREAU OF PRISONS.  GIVEN THAT IN
CERTAIN RESPECTS -- I WANT TO BEGIN WITH THE SITUATION WITH MR.
-- WITH ALEX PAPIERNIK WHERE HE WAS 17.  THE GOVERNMENT'S
INFORMATION IS THAT HE WAS 17.  SOMEONE OFFHAND MADE A
STATEMENT THAT HE WAS 16, AND THE 16-YEAR-OLD AGE WAS APPEARING
IN THE PSR AND BEING USED, EVEN THOUGH THAT'S A FACTUALLY

INACCURATE STATEMENT OF A WITNESS, AND I THINK THAT'S OUR
CONCERN WITH MANY OF THE FACTUAL DISPUTES IS THAT THERE WERE
THESE LAYERS OF HEARSAY IN TERMS OF PEOPLE COULDN'T SAY WHY
THEY HAD THE INFORMATION THEY HAD.

THAT WAS CLEAR IN TERMS OF A REPORT FROM AN EMPLOYER IN
TAMPA ABOUT AN ALLEGED DOMESTIC VIOLENCE OFFENSE. THERE WERE
NO POLICE REPORTS THAT BACKED THAT UP. THERE WAS NO -- THE
INDIVIDUAL WASN'T SAYING, "I WAS THERE AND I SAW THIS" OR "MR.
MCLEOD SAID THIS TO ME," HE JUST SAID, "THIS IS WHAT I
UNDERSTOOD HAPPENED," AND THAT KIND OF INFORMATION ISN'T
SUFFICIENTLY RELIABLE TO BE INCLUDED IN THE PRESENTENCE REPORT,
AND I THINK THAT'S FAIRLY WELL LAID OUT IN OUR FACTUAL
OBJECTIONS.

I UNDERSTAND THAT THE PROBATION OFFICER IS SAYING,
"LOOK THESE ARE THE REPORTS WE HAD. THIS IS IS WHERE THE
INFORMATION CAME FROM," AND THE COURT'S IN SOME REGARD RELYING
ON THE INFORMATION THAT WAS PROVIDED TO THE PROBATION OFFICER.
OUR CONCERN IS NOT THAT WHAT WAS GIVEN TO THE PROBATION OFFICER
WAS SOMEHOW DONE INCORRECTLY, BUT THAT THE REPORTING PARTIES
THAT PROVIDED THE INFORMATION THAT WENT IN THE REPORT, THAT
WENT TO THE PROBATION OFFICER, THERE WAS NO INDICATION OF WHERE
THEY RECEIVED THEIR INFORMATION FROM OR WHY WE SHOULD RELY ON
IT, WHY IT SHOULD BE CONSIDERED AS TRUTHFUL. AND I THINK THE
SITUATION WITH THIS ALEX PAPIERNIK, AND THE ALLEGATIONS OF
DOMESTIC VIOLENCE THAT CAME FROM SOMEONE WHO MAY HAVE WORKED

WITH MR. MCLEOD IN THE PAST, ARE PERFECT EXAMPLES OF THE
UNRELIABILITY OF THAT INFORMATION.

I'M NOT SURE HOW MUCH ALL OF THAT IS PLAYING INTO THE
COURT'S CALCULATION OF SENTENCING BECAUSE THAT'S A SEPARATE
CONCERN, BUT INSOFAR AS IT'S INCLUDED IN THE PRESENTENCE
REPORT, THAT KIND OF INFORMATION CAN LEAD TO ISSUES WITH MR.
MCLEOD'S PROGRAMMING, CAN BE USED TO ATTEMPT TO CIVILLY COMMIT
HIM LATER ON, AND SO IT IS VERY IMPORTANT THAT WE ARE CERTAIN
THAT ANY KIND OF ALLEGATIONS SUCH AS THAT ARE NOT JUST
SUFFICIENTLY RELIABLE TO -- ARE MORE RELIABLE THAN WHAT THAT
INFORMATION IS BECAUSE OF THE DOUBLE LAYERS OF HEARSAY.

IN LARGE PART, THE PROBATION OFFICER'S RESPONSE WAS,
"LOOK, THIS WAS INFORMATION PROVIDED TO US, AND IT'S PROPERLY
INCLUDED," AND DOESN'T REALLY EXPLAIN WHY WE SHOULD BE RELYING
ON THAT INFORMATION, AND DOESN'T INCLUDE SOME OF THE OTHER
INFORMATION THAT'S RELEVANT, YOU KNOW, WITH REGARD TO SOME OF
THE THINGS THAT WERE LEFT OUT OF THE PROBATION REPORT, IN TERMS
OF EXPLAINING THE FULL CIRCUMSTANCES, AND THAT'S WHERE OUR
CONCERN REALLY WAS.

SO WITH THAT WE WILL SUBMIT ON OUR PAPERS, BUT I DO
HAVE CONCERNS ABOUT THE COURT'S USE OF SOME OF THIS INFORMATION
IN TERMS OF SENTENCING AND ITS APPEARANCE IN THE PRESENTENCE
REPORT.

THE COURT:  YOU'RE GOING TO GET ONE OPPORTUNITY, MS.
MORGAN, TO TELL ME EVERYTHING YOU WANT TO TELL ME WITH REGARD

1    TO ANY OF THE OBJECTIONS THAT I'VE ALREADY ADDRESSED, AND WITH

2    REGARD TO THE ISSUE OF SENTENCING ITSELF, MA'AM.  SO PLEASE GO

3    AHEAD.

4         MS. MORGAN:  I'M GOING TO FLIP THROUGH -- I KNOW WE

5    FILED RATHER LENGTHY OBJECTIONS, SO IT'S HARD FOR ME TO NOT

6    JUST GO THROUGH.

7         IN TERMS OF OUR OBJECTIONS THAT THE PROBATION OFFICER

8    LEFT OUT ALL OF THE COMMUNICATIONS FROM JOHNATHAN TO MR.

9    MCLEOD, DESCRIBING THAT HE HAD THIS HORRIBLE LIFE AND ALL THOSE

10   THINGS --

11        THE COURT:  PLEASE, LET'S REMEMBER I TRIED THIS CASE.

12        MS. MORGAN:  RIGHT.

13        THE COURT:  AND THIS CASE WILL NOT BE FORGOTTEN BY THE

14   COURT OR BY ANYBODY ELSE WHO SAT THROUGH THIS TRIAL, MA'AM, SO

15   I WILL UNDERSTAND THAT.

16        AS FAR AS SENTENCING GOES, I'M PREDOMINANTLY

17   INFLUENCED, IF NOT EXCLUSIVELY INFLUENCED, BY WHAT I HEARD AT

18   THE TRIAL.  NOW, I KNOW THAT DOESN'T ADDRESS YOUR CONSIDERATION

19   FOR THE BUREAU OF THE PRISONS, THAT'S THE OTHER ISSUE, BUT FOR

20   SENTENCING PURPOSES I THINK YOU CAN RELY ON THAT.

21        MS. MORGAN:  I WAS GOING TO SAY THAT DOES GIVE ME SOME

22   GUIDANCE IN TERMS OF, YOU KNOW, WHERE WE NEED TO PLACE OUR

23   EMPHASIS SO TO SPEAK.

24        I THINK THE PROBATION OFFICE DID CLARIFY -- I WANT TO

25   ADDRESS SPECIFICALLY THE GUN FOUND IN THE CAR -- IN MR.

MCLEOD'S CAR AT THE AIRPORT, WHICH WASN'T PRODUCED AT TRIAL, IT
WASN'T AN ISSUE AT TRIAL, AND THE INCLUSION OF THAT AS PART OF
THE OFFENSE CONDUCT.  THERE IS NO DISPUTE THAT THAT GUN WAS
LAWFULLY REGISTERED TO MR. MCLEOD, THAT IT WAS LAWFULLY IN HIS
POSSESSION, AND THERE'S NO ALLEGATION THAT AT ANY TIME ANYONE
WAS THREATENED BY THE GUN, SAW THE GUN, THAT IT WAS ANYTHING
OTHER THAN THE GUN THAT WAS PROPERLY KEPT IN MR. MCLEOD'S
VEHICLE.

        I UNDERSTAND THAT IN SAN DIEGO IT IS ODD FOR PEOPLE TO
HAVE GUNS IN THEIR CAR, BUT IN TAMPA, FLORIDA, THAT'S ACTUALLY
A PRETTY NORMAL THING WHEN PEOPLE HAVE REGISTERED WEAPONS, THEY
HAVE THEIR PROPER PERMITS, THEY DO JUST KEEP THEM IN THEIR CAR.
IT IS NOT AN ABNORMAL SITUATION.  I DON'T BELIEVE THAT THAT WAS
PROPERLY INCLUDED AS PART OF THE OFFENSE CONDUCT.

        THERE'S NO INDICATION AT ANY TIME THAT ANYONE WAS EVEN
AWARE OF THAT GUN, JOHNATHAN SPECIFICALLY, UNTIL WELL AFTER MR.
MCLEOD AND JOHNATHAN WERE ARRESTED.  I KNOW THAT THE REVELATION
REGARDING THAT GUN, THAT THERE WAS THIS GUN FOUND IN THE CAR,
HAS BEEN ADDRESSED IN TERMS OF THE VICTIM IMPACT STATEMENTS AND
THE AFFECT THAT THAT HAD ON THEM, WHICH IS UNDERSTANDABLE IN
SOME REGARD, BUT IS ALSO SOMEWHAT SEPARATE -- IT'S JUST
SEPARATE FROM THE OFFENSE CONDUCT.

        IT IS A FACT -- THE FACT THAT MR. MCLEOD HAD A
PROPERLY-REGISTERED FIREARM I HAVE NO OBJECTION TO BEING
INCLUDED IN THE PRESENTENCE REPORT, BUT I DO HAVE OBJECTIONS

WITH IT BEING INCLUDED AS PART OF THE OFFENSE CONDUCT BECAUSE
IT'S SEPARATE FROM THE OFFENSE, AND HIS POSSESSION OF A WEAPON
IN REGARDS TO HIS OFFENSE CAN AFFECT HIS ABILITY AT THE BOP TO
PROGRAMS BECAUSE IF YOU ARE IN POSSESSION OF A GUN AS PART OF
YOUR OFFENSE, YOU ARE PROHIBITED FROM PARTICIPATING IN CERTAIN
KINDS OF PROGRAMMING.

AND OBVIOUSLY I WOULDN'T BE MAKING THIS OBJECTION OR
HAVING THIS CONVERSATION IF THE GUN WAS ON MR. MCLEOD OR WAS IN
HIS BAG OR WAS WITH HIM WHEN HE TRAVELED TO CALIFORNIA, BUT
THAT'S NOT THE CASE.  IT WAS IN FLORIDA, IN HIS CAR, PROPERLY
REGISTERED, PROPERLY PLACED.  THERE WAS NOTHING UNLAWFUL ABOUT
IT, AND INCLUSION OF THAT AS PART OF THE OFFENSE CONDUCT WOULD
HAVE A SEVERE IMPACT ON MR. MCLEOD'S ABILITY TO PROGRAM AND
REHABILITATE WITHIN THE BUREAU OF PRISONS, AND SO WE ARE
STANDING BY OUR OBJECTION THAT THAT SHOULD NOT BE INCLUDED AS
PART OF THE OFFENSE CONDUCT.  WHILE IT IS TOTALLY PROPER FOR
THE COURT TO CONSIDER THAT MR. MCLEOD HAD GONE THROUGH THE
PERMITTING PROCESS AND HAD OWNED FIREARMS LAWFULLY, IT ISN'T
PART OF THE OFFENSE CONDUCT.

WE STAND BY ALL OF OUR -- I THINK THAT EVERYBODY HAS
FLESHED OUT THE CONVERSATION ABOUT THE TENNESSEE MENTAL HEALTH
INSTITUTE AND OUR INCLUSION OF THAT IN THE PRESENTENCE REPORT,
AND I UNDERSTAND THE COURT'S RULING ON THAT.

I SUPPOSE ONE OF MY CONCERNS IS WHEN THE PROBATION
OFFICER SAYS THAT OUR OBJECTIONS ARE NOTED, I'M NOT SURE HOW

THAT FACTUALLY -- WHAT THAT DOES TO IMPACT HOW THE PRESENTENCE REPORT IS TRANSMITTED TO THE BUREAU OF PRISONS. AS THE COURT IS WELL AWARE, POST-SENTENCING THE PROBATION OFFICE ELECTRONICALLY SUBMITS THE PSR, I BELIEVE THE ADDENDUM TO THE PSR OR ANY AMENDED PSR, ALONG WITH ANOTHER PACKET OF MATERIAL TO THE BUREAU OF PRISONS. SO WHEN IT SAYS THAT OUR OBJECTIONS ARE NOTED AND THAT THE INFORMATION WAS TAKEN FROM INFORMATION PROVIDED BY THE, YOU KNOW, THE AUSA OR WHATEVER, HOW THAT IMPACTS THE FINAL SUBMISSION TO THE BOP IS SOMEWHAT CONCERNING FOR US BECAUSE THE BOP DOESN'T GET MY OBJECTION. THE BOP DOESN'T RECEIVE MY SENTENCING MEMORANDUM. ALL THE BOP KNOWS ABOUT THIS CASE AND ABOUT --

(DISCUSSION HELD OFF THE RECORD.)

THE COURT: I'M SORRY.

MS. MORGAN: THAT'S OKAY.

THE COURT: GO AHEAD.

MS. MORGAN: BECAUSE OF THE SUBMISSIONS PROCESS TO THE BUREAU OF PRISONS, THEY ARE NOT PROVIDED WITH -- THE BUREAU OF PRISONS DOESN'T GET THIS WHOLE PACKET WITH ALL OF MY OBJECTIONS, AND ALL OF OUR EXPLANATIONS FOR THINGS, AND STATEMENTS ABOUT THINGS. THEY ONLY GET THE SUBMISSION FROM THE PROBATION OFFICE, WHICH IS THE PRESENTENCE REPORT, THE ADDENDUM, OR ANY AMENDED PRESENTENCE REPORT BASED ON THE COURT'S RULING ON THE OBJECTIONS. SO WHEN THEY JUST SAY THAT OUR OBJECTIONS ARE NOTED, THAT DOESN'T PROVIDE SUFFICIENT

1    CLARIFICATION TO THE BUREAU OF PRISONS, WHICH IF -- THEY RELY

2    ON THE PRESENTENCE REPORT SOLELY IN DETERMINING PLACEMENT, AND

3    PROGRAMMING, AND SECURITY, AND HOUSING DESIGNATIONS, ALL OF

4    THAT, SO I FRANKLY DON'T KNOW WHAT IT MEANS FOR THAT PROCESS

5    WHEN THE PROBATION OFFICER JUST SAYS THAT OUR OBJECTIONS ARE

6    NOTED, AND THAT IS OF CONCERN TO ME.

7           AS IS THE INCLUSION OF MATERIALS ALLEGING THAT THE

8    STATEMENT OF THE AUSA ALLEGING THAT MR. MCLEOD WAS SEXUALLY

9    HARASSING AT THE MCC, GIVEN THAT THERE WERE DISCIPLINARY

10   RECORDS PRODUCED FROM MCC SHOWING THAT NO DISCIPLINARY ACTION

11   OCCURRED, ALONG WITH THE MCC AND BOP'S POLICY AND REGULATIONS

12   REGARDING THE PRISON RAPE ELIMINATION ACT OR PRIA, P-R-I-A,

13   IT'S CONCERNING THAT THAT'S IN THERE BECAUSE AFTER THE FACT MR.

14   MCLEOD'S SECURITY DESIGNATION, HIS HOUSING, HIS PROGRAMMING

15   STATUS, ALL OF THAT.

16          NOW, BOP WILL RECEIVE THE RECORDS FROM MCC, WHICH

17   OBVIOUSLY DOESN'T INCLUDE ANY OF THIS.  THERE WAS NO

18   INVESTIGATION.  THERE WAS NO ALLEGATIONS MADE.  THERE WAS

19   NOTHING DONE THROUGH MCC, PERIOD.  IT WAS SIMPLY AN INDIVIDUAL

20   WHO CAME FORWARD OFFERING TO DEBRIEF WITH THE GOVERNMENT IN

21   EXCHANGE FOR WHAT WE DON'T KNOW OR IF ANYTHING WAS OFFERED OR

22   IF IT WAS A "COME IN AND TELL US WHAT YOU KNOW, AND WE'LL

23   DECIDE IF WE GIVE YOU SOMETHING," FINE, BUT THAT'S THE CONTEXT

24   IN WHICH THESE AROSE.  AND BECAUSE THERE WAS NO DOCUMENTARY

25   BACKUP FOR THAT AT THE MCC, I WOULD REQUEST IT BE STRICKEN FROM

THE PSR BECAUSE AGAIN IT AFFECTS MR. MCLEOD'S ABILITY TO
PROGRAM AND BE DESIGNATED IN AN APPROPRIATE FACILITY.

THESE ARE THINGS THAT ARE OF MUCH MORE SIGNIFICANCE FOR
SOMEONE WHO IS FACING THE LENGTHY PERIOD OF TIME THAT MR.
MCLEOD IS FACING.  THIS IS A MAN WHO IS LOOKING AT A MINIMUM OF
15 YEARS IN PRISON, AND SO HIS ABILITY TO PROGRAM AND BE
PROPERLY DESIGNATED IS MUCH MORE SIGNIFICANT THAN SOMEONE WHO
IS MAYBE LOOKING AT A YEAR.

I THINK THOSE ARE THE PRIMARY OBJECTIONS AND THE
REASONS FOR THOSE OBJECTIONS AND THE REASON WHY WE FEEL SO
STRONGLY ABOUT THOSE SPECIFIC PIECES OF INFORMATION BEING
STRICKEN IS THAT THEY ARE REALLY NOT FOUNDED -- AT LEAST WITH
REGARD TO THE ALLEGATIONS REGARDING THE MCC, THEY'RE
CONTRADICTED BY ACTUAL RECORDS FROM THE MCC.

I UNDERSTAND WHY THE INFORMATION WAS PROVIDED TO THE
PROBATION OFFICER.  THE QUESTION IS WHETHER OR NOT IT REALLY
SHOULD BE INCLUDED IN THE PRESENTENCE REPORT, AND I SUPPOSE
MAYBE THE PROBATION OFFICER IS IN THE BEST POSITION TO CLARIFY
FOR US AND THE COURT WHEN THEY SAY OUR OBJECTIONS ARE NOTED,
WHAT THAT LOOKS LIKE IN TERMS OF --

THE COURT:  WHEN WE GET TO PROBATION, I'M SURE SHE'LL
SET THAT OUT.

MS. MORGAN:  ABSOLUTELY.  OUR PRIMARY CONCERNS ARE THE
INCLUSION OF THE GUN AS PART OF THE OFFENSE CONDUCT BECAUSE
THAT WILL CATEGORICALLY PROHIBIT HIM FROM MANY KINDS OF

PROGRAMMING.  THE BOP HAS VERY STRICT RULES ABOUT THIS, AND SO
WE ASK THAT THAT INFORMATION BE STRICKEN FROM THE OFFENSE
CONDUCT SO THAT MR. MCLEOD CAN PROGRAM EFFECTIVELY.  I THINK
THAT'S SOMETHING THAT EVERYBODY WOULD WANT FOR HIM IS TO BE
ABLE TO PARTICIPATE IN REHABILITATIVE PROGRAMS WHILE AT THE
MCC, AND THE STRIKING OF ANY ALLEGATIONS OF SEXUAL MISCONDUCT
AT THE MCC BECAUSE THOSE ARE THINGS THAT ARE GOING TO DIRECTLY
IMPACT HIS DESIGNATION AND HIS PROGRAMMING ABILITIES.

WE STILL STAND BY ALL THE REST OF OUR OBJECTIONS.

THE COURT:  I UNDERSTAND.

MS. MORGAN:  BUT THOSE ARE OUR PRIMARY CONCERNS.  WITH
THAT, I WILL SUBMIT ON THAT AS FAR AS THE OBJECTIONS GO.

THE COURT:  PLEASE CONTINUE.

MS. MORGAN:  I THINK THAT COVERS ALL OF THE OBJECTIONS
WE HAVE.  OBVIOUSLY, WE'VE PUT FORTH OUR LEGAL OBJECTIONS TO
THE GUIDELINES ENHANCEMENTS.  I UNDERSTAND THE COURT'S
STATEMENT THAT THE JURY CLEARLY CREDITED THE TESTIMONY OF
JOHNATHAN, AND THAT'S WHY THE SEXUAL CONDUCT ENHANCEMENT SHOULD
APPLY.  I HAVE SOME CONCERN ABOUT THAT BECAUSE THE JURY WAS
NEVER ASKED THE QUESTION OF WHETHER THEY BELIEVED THOSE
INCIDENTS TOOK PLACE.

THE QUESTION THEY WERE ASKED TO ANSWER WAS WHETHER OR
NOT THEY BELIEVED THAT MR. MCLEOD TRAVELED WITH THE INTENT TO
HAVE SEXUAL CONTACT WITH THIS MINOR, AND WHETHER THE MINOR --
HE INDUCED THE MINOR TO TRAVEL WITH THE INTENT OF HAVING SEXUAL

CONTACT.  HIS INTENT IS SEPARATE AND APART WHOLLY FROM THE
ALLEGATIONS OF PHYSICAL TOUCHING.  WHILE ONE COULD SAY THAT THE
JURY CREDITED JOHNATHAN'S TESTIMONY, CERTAINLY MR. MCLEOD WAS
CONVICTED, SO THERE WAS SOMETHING THERE THAT THEY BELIEVED, BUT
WE DON'T KNOW EXACTLY WHAT, AND THEY WERE NOT ASKED TO
SPECIFICALLY FIND OR NOT FIND ANYTHING ABOUT THOSE ALLEGATIONS,
AND SO -- MR. MCLEOD DENIES THEM.  I THINK THAT -- OBVIOUSLY,
THE COURT'S HEARD THE TRIAL.  WE RAISED SUBSTANTIAL QUESTIONS
ABOUT WHETHER OR NOT THESE THINGS COULD HAVE ACTUALLY HAPPENED
IN THE WAY THAT WERE TESTIFIED TO.

THIS IS NOT, OBVIOUSLY, THE PLACE TO RELITIGATE FACTS,
BUT I DON'T BELIEVE THAT THERE WAS SUFFICIENT RELIABLE EVIDENCE
TO WARRANT THAT PARTICULAR GUIDELINE ENHANCEMENT, AND I DO
THINK THAT IT'S IMPROPER TO SAY THAT THE JURY CREDITED HIS
TESTIMONY AND, THUS, THAT DECISION ONLY INSOFAR AS THE JURY
WASN'T ASKED THAT QUESTION.  WE DON'T KNOW WHAT PARTS OF
JOHNATHAN'S TESTIMONY THEY BELIEVED OR NOT BELIEVED.  WE
INSTRUCT THE JURY THAT THEY CAN BELIEVE, SOME OF IT, ALL OF IT,
NONE OF IT, AND WE DON'T KNOW, AND NOR WILL WE EVER KNOW,
EXACTLY WHAT THEY BELIEVED OR WHY.

AS TO THE UNDUE INFLUENCE, I UNDERSTAND THERE'S A
REBUTTABLE PRESUMPTION IN A CASE WHERE THERE'S A 10-YEAR AGE
DIFFERENCE; HOWEVER, WHAT WE KNOW IS THAT THESE TWO INDIVIDUALS
WERE NEVER FACE-TO-FACE BEFORE JUNE 10TH.  THEIR ONLY
RELATIONSHIP WAS DURING THIS GAME PLAY.  THIS WAS NOT A CASE

WHERE THIS WAS AN ADULT WHO WAS PROVIDING ANYTHING FOR HIM, WHETHER -- IN SOME OF THE OTHER CASES YOU SEE THEY WERE COACHES OR TEACHERS OR FRIENDS OR TAKING PEOPLE OUT TO DINNER, DOING SOMETHING TO FOSTER THAT RELATIONSHIP. THIS WAS AN ONLINE GAMING RELATIONSHIP THAT LASTED A LITTLE MORE THAN A MONTH BEFORE MR. MCLEOD'S ARREST IN THIS CASE. HE -- MR. MCLEOD IN FACT HAD NO CONTACT FROM MAY 27TH TO JUNE 7TH, SO THE UNDUE INFLUENCE ONLY RELATES TO THE TRAVEL COUNTS.

THE UNDUE INFLUENCE ENHANCEMENT ISN'T -- IS SEPARATE AND APART FROM THE PRODUCTION OF CHILD PORNOGRAPHY COUNTS. OBVIOUSLY THE RELATIONSHIP, FOR LACK OF A BETTER WAY TO PUT IT, CARRIES OVER, BUT WHEN WE'RE TALKING ABOUT UNDUE INFLUENCE, I THINK IT IS IMPORTANT, AS THE COURT KNOWS FROM THE TRIAL, THAT THERE WAS NO CONTACT BETWEEN THESE TWO INDIVIDUALS FROM MAY 27TH TO JUNE 7TH, AND IT WASN'T UNTIL JOHNATHAN, WHO REGAINED POSSESSION OF HIS PHONE, EMAILED, AND REINITIATED THE CONTACT WITH MR. MCLEOD THAT THINGS WERE SET IN MOTION FOR THE TRAVEL, AND SO THAT'S WHY I THINK WE HAVE REBUTTED THAT PRESUMPTION OF UNDUE INFLUENCE OF MR. MCLEOD, ESPECIALLY IN THE CASE WHERE THE MINOR ACTUALLY REACHES OUT BACK TO THE ADULT TO REINITIATE CONTACT PRIOR TO THE TRAVEL.

THE COURT SAW, AND WITHOUT GETTING INTO THE FACTS -- OBVIOUSLY, THE COURT WAS HERE AND SAW ALL OF THE TESTIMONY, BUT THERE WERE SUFFICIENT AMOUNTS OF EMAIL MESSAGES SHOWING THE MINOR WAS ENCOURAGING MR. MCLEOD TO COME VISIT HIM, THAT THIS

WAS NOT MR. MCLEOD URGING HIM TO "LET ME COME VISIT YOU."  IT

WAS TWO WAYS.

WHAT WE'RE TALKING ABOUT IS NOT AT ALL -- I'M NOT AT

ALL TRYING TO BLAME JOHNATHAN.  THAT'S NOT WHAT I'M TRYING TO

SAY HERE AT ALL, BUT THE QUESTION IS WHETHER OR NOT MR. MCLEOD

HAD SOME KIND OF UNDUE INFLUENCE OVER THIS MINOR THAT MADE HIM

DO THESE THINGS, AND I THINK THAT THE MINOR'S BEHAVIOR IN THAT

REGARD IS RELEVANT AND IMPORTANT TO LOOK AT WHEN WE'RE

DETERMINING WHETHER OR NOT THE ADULT HAD SOME KIND OF UNDUE

INFLUENCE OR UNIQUE POWER OVER HIM.

AND I THINK IN THIS CASE, GIVEN THAT IT WAS JOHNATHAN

REINITIATING CONTACT, JOHNATHAN HAD PREVIOUSLY SUGGESTED TO MR.

MCLEOD THAT MR. MCLEOD COME VISIT HIM, THAT HE DO SO ON A

SPECIFIC TIME FRAME, AND THINGS LIKE THAT, THAT UNDERCUTS THIS

NOTION THAT JUST BECAUSE OF THE AGE DIFFERENCE MR. MCLEOD HAD

SOME UNDUE INFLUENCE OVER HIM, AND SO WE DO MAINTAIN OUR

OBJECTION TO THAT.

AS FAR AS THE -- THAT BRINGS ME TO THE LAST THING, AS

FAR AS THE COURT'S RULINGS ON THE CONDITIONS OF SUPERVISED

RELEASE, I THINK THE COURT'S AMENDMENTS TO CONDITIONS 7, 8 AND

9 SATISFY OUR OBJECTIONS.

THE COURT:  OKAY.

MS. MORGAN:  WE STAND BY OUR OBJECTIONS TO THE OTHER

CONDITIONS; HOWEVER, I'LL SUBMIT ON MY BRIEFING ON THOSE, AND I

DO THINK THAT THE COURT'S AMENDMENT TO 7, 8 AND 9 SUFFICIENTLY

RESOLVE OUR CONCERNS.

AND WITH THAT, I THINK I'VE COVERED EVERYTHING I WANT
TO SAY ABOUT THE OBJECTIONS.

THE COURT: WELL, CONTINUE, IF THERE'S MORE THAT YOU
WISH TO SAY ABOUT ANYTHING ELSE WITH REGARD TO SENTENCING.
YOU'RE GOING TO GET ONE OPPORTUNITY TO ADDRESS EVERYTHING. IF
THAT CONCLUDES THE OBJECTIONS, YOU MAY PROCEED.

MS. MORGAN: PERFECT. THEN THAT BRINGS ME TO WHAT IS
A SUFFICIENT SENTENCE, RESOLVING ALL THESE OBJECTIONS, AND
LOOKING AT WHAT SENTENCE IS SUFFICIENT WITHOUT BEING GREATER
THAN NECESSARY TO SERVE THE PURPOSES OF SENTENCING, AND WHAT
THIS CASE IS -- THIS WAS A DIFFICULT CASE FOR EVERYONE
INVOLVED, AND IT'S NOT LOST ON ANYONE THAT THERE WAS DAMAGE
CAUSED ON ALL SIDES. IT'S NOT LOST ON MR. MCLEOD, AND IT
CERTAINLY ISN'T LOST ON ANYBODY THAT'S SITTING IN THIS ROOM THE
DIFFICULTY OF THIS CASE AND WHAT HAPPENED, BUT THE QUESTION
HERE IS HOW MUCH TIME IS ENOUGH TIME TO MEET ALL THE PURPOSES
OF SENTENCING, AND WE ARE REQUESTING A SENTENCE OF 15 YEARS,
WHICH IS A VERY SIGNIFICANT SENTENCE IN ANY WORLD.

MR. MCLEOD WAS 35 YEARS OLD AT THE TIME THIS OFFENSE
WAS COMMITTED. 15 YEARS IS JUST UNDER HALF OF HIS LIFE AND
MORE THAN HALF OF HIS ADULT LIFE. IT PUTS HIM LEAVING PRISON
IN HIS LATE 40'S.

MR. MCLEOD IS A MAN WHO BY ALL ACCOUNTS HAD ONE OF THE
MOST DIFFICULT AND HORRIBLE UPBRINGINGS THAT ONE COULD IMAGINE.

1    HIS MOTHER WAS -- HAD COGNITIVE IMPAIRMENTS, WAS PHYSICALLY AND

2    EMOTIONALLY ABUSIVE.  HIS BIOLOGICAL FATHER WAS SEXUALLY

3    ABUSIVE.  HE WAS OFTEN NEGLECTED AND NOT CARED FOR.  THERE WAS

4    CPS INVOLVEMENT WHEN HE WAS A TODDLER.  HIS FATHER WAS SEXUALLY

5    ABUSING HIM FOR YEARS, AND IT WASN'T REALLY -- AND MR. MCLEOD

6    WASN'T BELIEVED OR LISTENED TO ABOUT ANY OF THAT UNTIL HIS

7    MOTHER AND FATHER DIVORCED BECAUSE OF HIS FATHER'S INFIDELITY

8    AND THEY WERE GOING THROUGH THE DIVORCE PROCESS, AND IT WAS

9    ONLY AT THAT TIME THAT HIS MOTHER DECIDED THAT IT WOULD BE

10   APPROPRIATE TO COME FORWARD TO AUTHORITIES.

11       PRIOR TO THAT, MR. MCLEOD HAD BOUNCED AROUND WITH CPS

12   INVOLVEMENT AND LIVED WITH HIS MATERNAL GRANDMOTHER, AND HIS

13   BIOLOGICAL FATHER I THINK IS STILL SERVING A 40-YEAR PRISON

14   SENTENCE THAT HE RECEIVED FOR MOLESTING MR. MCLEOD, MR.

15   MCLEOD'S SISTER AND A NEIGHBOR CHILD WHEN THEY WERE VERY YOUNG,

16   YOU KNOW, 5, 6, 7 YEARS OLD.

17       MR. MCLEOD'S MOTHER WAS HORRIBLY PHYSICALLY ABUSIVE TO

18   HIM.  MR. MCLEOD, BEFORE HE WAS EVEN A TEENAGER, STRUGGLED WITH

19   SUICIDAL IDEATION, AND ANGER OUTBURSTS, AND STRUGGLED IN

20   SCHOOL.  HIS GRANDMOTHER, WHO CARED FOR HIM A GOOD PORTION OF

21   TIME, WAS UNABLE TO CONTROL HIM, I THINK PRIMARILY BECAUSE OF

22   HER AGE AND BECAUSE SHE JUST WAS ILL-EQUIPPED TO RAISE SOMEONE

23   WHO HAD BEEN GOING THROUGH ALL THE THINGS THAT MR. MCLEOD HAD

24   BEEN GOING THROUGH, AND THAT'S WHAT RESULTED HIM BEING PLACED

25   IN A GROUP HOME SETTING.

1    HE WAS PLACED IN A GROUP HOME WHEN HE WAS 9, AND HE

2    STAYED IN GROUP HOMES AND RESIDED IN GROUP HOMES SURROUNDED BY

3    OTHER KIDS WHOSE PARENTS HAD ABUSED THEM, WHOSE PARENTS COULD

4    NOT CARE FOR THEM, WHO COULD NOT TRANSITION BACK.  SOME OF

5    THOSE KIDS SPENT THEIR TIME IN THE GROUP HOME, THE FAMILIES

6    WORKED IT OUT, AND THEY WERE ABLE TO TRANSITION BACK, BUT NOT

7    MR. MCLEOD.

8    MR. MCLEOD WAS LEFT THERE LANGUISHING AND GROWING UP

9    AND NOT HAVING ANYONE, AND THEN HE STARTED TO AGE.  HE

10   EVENTUALLY GOT TO THE POINT WHERE HE WAS AGING OUT OF THE

11   PROGRAM THAT HE WAS IN, AND THERE WAS A FAMILY COURT HEARING

12   TRYING TO FIGURE OUT WHAT TO DO WITH THIS TEENAGE BOY.  THAT

13   MUST HAVE BEEN SUCH A TRAUMA -- IT WAS A VERY TRAUMATIZING

14   EXPERIENCE FOR MR. MCLEOD.  "YOU CAN'T GO HOME, BUT YOU CAN'T

15   STAY HERE, AND THERE IS NO ONE ELSE FOR YOU."  THAT WAS WHAT

16   WAS HAPPENING IN THE FAMILY COURT, AND THE FAMILY COURT JUDGE,

17   WHO WAS DOING THE VERY BEST HE COULD WITH THE SITUATION, WAS

18   LIKE, "WELL, I CAN'T FORCE THE PROGRAM TO KEEP HIM BECAUSE HE'S

19   TOO OLD, BUT CERTAINLY EVERYBODY AGREES HE CAN'T GO HOME

20   BECAUSE THAT'S UNSAFE AND UNTENABLE, WHAT DO WE DO WITH HIM?"

21   MR. DICKERSON, WHO IS PRESENT IN COURT TODAY, AND IS

22   THE MAN THAT MR. MCLEOD REFERS TO AS HIS FATHER, HAD BEEN THE

23   DIRECTOR OF THE WILDERNESS PROGRAM, HAD BEEN A COUNSELOR THERE,

24   HAD WORKED WITH MR. MCLEOD ESSENTIALLY AS A TEENAGER.  HE WAS

25   ACTUALLY NOT WORKING WITH HIM ANYMORE BECAUSE HE WAS IN A

1    DIFFERENT PROGRAM, BUT WAS CALLED TO TESTIFY AT HIS HEARING AND

2    THE FAMILY COURT JUDGE SAID TO MR. DICKERSON, "CAN YOU TAKE HIM

3    HOME FOR THE WEEKEND UNTIL WE CAN FIGURE OUT WHAT TO DO?"

4    WHICH IS KIND OF INTERESTING -- MUST HAVE BEEN KIND OF AN

5    INTERESTING DAY IN FAMILY COURT FOR A JUDGE TO REACH THAT

6    POINT, BUT I THINK IT WAS JUST A LOSS OF WHAT TO DO.  MR.

7    DICKERSON SAID, "OKAY, I'LL TAKE HIM HOME FOR THE WEEKEND.

8    WE'LL SEE HOW THIS WORKS OUT."

9         AT THE TIME MR. DICKERSON WAS LIVING WITH HIS ELDERLY

10   MOTHER.  MR. DICKERSON IS AN ONLY CHILD, FATHER HAD BEEN GONE

11   FOR A NUMBER OF YEARS, AND HE AND HIS MOTHER RESIDED TOGETHER,

12   AND TONY CAME HOME WITH THEM.  THE SITUATION WORKED OUT AND MR.

13   DICKERSON SAID, "YOU CAN MAKE HIM A PERMANENT PLACEMENT," AND

14   MR. DICKERSON BECAME HIS FOSTER FATHER.

15        THEY NEVER FINALIZED THE ADOPTION BECAUSE OF CERTAIN --

16   THERE WERE CERTAIN BENEFITS THAT MR. MCLEOD COULD RECEIVE BY

17   BEING MAINTAINED AS A FOSTER CHILD, COLLEGE EDUCATION, TUITION,

18   THINGS LIKE THAT, THAT WOULD NOT HAVE BEEN AVAILABLE TO HIM IF

19   MR. DICKERSON HAD ADOPTED HIM.

20        MR. DICKERSON AND HIS MOTHER DID THEIR VERY BEST TO

21   PROVIDE A NORMAL UPBRINGING AT THAT POINT.  AT THAT POINT MR.

22   MCLEOD WAS 15.  HE HAD ALREADY HAD AS MUCH DAMAGE AS AN -- IN

23   HIS EARLY CHILDHOOD AS ONE CAN HAVE.  IT BEARS ON THIS CASE I

24   THINK IN TERMS OF HOW THINGS CAME ABOUT.  I UNDERSTAND THAT

25   THIS IS A VERY SERIOUS CASE, AND I UNDERSTAND THAT THERE WERE

1    DIFFERENT THINGS, BUT MR. MCLEOD'S WORLD VIEW, HIS TEENAGE

2    UPBRINGING, HIS EXPERIENCE AS A TEEN WAS THAT OF BEING

3    SURROUNDED BY PEOPLE WHOSE PARENTS WERE ABUSING THEM IN SUCH A

4    WAY THEY WERE REMOVED FROM THEIR HOMES.

5         THAT WAS HIS PEER GROUP.  THAT'S WHO HE WAS SURROUNDED

6    BY.  AND WHAT HE LEARNED FROM PEOPLE, AND WHAT HE KNEW FROM HIS

7    OWN EXPERIENCE, IS THAT THEY MINIMIZED THE ACTUAL ABUSE THAT

8    WAS GOING ON IN THEIR HOME.  NO ONE SAID THINGS WERE AS BAD AS

9    THEY WERE.  EVERYONE MINIMIZED, WHICH IS VERY DIFFERENT THAN

10   THE TEENAGE EXPERIENCE THAT MOST OF US HAVE.

11        THE TEENAGE EXPERIENCE THAT MOST OF US HAVE IS WE ALL

12   COMPLAIN ABOUT OUR PARENTS AND HOW MEAN THEY ARE AS TEENAGERS.

13   THEY SET CURFEWS.  THEY WON'T LET US DRIVE CARS.  THEY WON'T

14   LET US COME AND GO AS WE PLEASE, AND THAT MAKES THEM HORRIBLE

15   PEOPLE.  I THINK THAT'S THE EXPERIENCE THAT MOST TEENAGERS

16   HAVE, TALKING TO THEIR FRIENDS ABOUT HOW MEAN THEIR PARENTS ARE

17   BECAUSE THEY WON'T JUST GIVE THEM A BLANK CHECK AND THE CAR

18   KEYS AND SAY, "COME HOME WHEN YOU FEEL LIKE IT."  BUT THAT WAS

19   NOT MR. MCLEOD'S EXPERIENCE.  MR. MCLEOD'S EXPERIENCE WAS

20   HEARING TEENAGERS AND YOUNG PEOPLE TALK ABOUT HOW HORRIBLY THEY

21   WERE ABUSED.

22        AS ADULTS WE ALL LOOK BACK AND SAY, "I CAN'T BELIEVE

23   THAT I COMPLAINED ABOUT HOW MEAN MY MOM WAS WHEN SHE WOULDN'T

24   GIVE ME A BLANK CHECK, AND THE CAR KEYS OR SET CURFEW OR SHE

25   SET RULES AND LIMITS ON ME, I THOUGHT SHE WAS SO MEAN," BUT AS

AN ADULT YOU LOOK BACK AT THAT AND YOU SAY, "SHE WAS JUST BEING A PARENT. MY DAD WAS JUST BEING A DAD. HE WAS SETTING THE RULES AND THE BOUNDARIES AND THE LIMITS THAT I NEEDED SET FOR ME BECAUSE I'M A TEENAGER, AND I SHOULDN'T BE MAKING THESE DECISIONS FOR MYSELF BECAUSE I'M NOT EQUIPPED TO DO SO."

MR. MCLEOD DIDN'T HAVE THAT. HE DIDN'T HAVE THAT LOOKING BACK ON WHEN YOU THOUGHT YOUR PARENTS WERE HORRIBLE AS A YOUNG PERSON AND REALIZING AS AN ADULT THEY WEREN'T SO BAD. THEY WERE JUST PARENTS BEING PARENTS. MR. MCLEOD AND HIS PEER GROUP WHEN THEY LOOK BACK ON THEIR CHILDHOOD GO, "NO, THAT WAS -- IT WAS STILL ABUSIVE. IT WAS ABUSIVE, AND IT WAS AWFUL, AND WE WERE MINIMIZING THAT DESCRIPTION," AND THAT'S THE MAN WHO -- THAT'S HOW MR. MCLEOD VIEWS -- THAT'S THE LENS WITH WHICH MR. MCLEOD VIEWS THE WORLD IS THAT WHEN PEOPLE, LIKE CHILDREN, WHEN ANYONE DESCRIBES BEING ABUSED, THEY ARE MINIMIZING IT. IT MUST BE WORSE THAN THEY'RE ACTUALLY SAYING.

I SAY THAT NOT IN TERMS OF WHAT WAS ACTUALLY GOING ON IN THE HOME OF JOHNATHAN AGUIRRE. IT'S NOT RELEVANT PARTICULARLY, AND I DON'T THINK THAT ANYONE NOW, LOOKING BACK, HAVING TRIED THE CASE, HAVING LOOKED THROUGH EVERYTHING, LOOKED AT EVERYTHING OVER THE LAST YEAR, WOULD SAY THAT IN ANY WAY THAT MR. AGUIRRE WAS BEING ABUSED IN HIS HOME IN JUNE OF 2013, BUT THAT WAS WHAT HE WAS SAYING, THAT WAS WHAT HE WAS TELLING MR. MCLEOD. AND MR. MCLEOD'S VIEW WAS NOT OUR VIEW OF "IF A KID'S SAYING THEY WON'T LET ME DO THIS AND THAT, HE'S PROBABLY

JUST EXAGGERATING AND BEING A TEEN," AND THAT'S WHAT CAUSED HIM TO REACT SO VISCERALLY IN TERMS OF BELIEVING THAT THIS WAS A PERSON WHO NEEDED RESCUING.

THAT'S NOT AN EXCUSE FOR WHAT HE DID. IT'S NOT AN EXCUSE FOR WHAT HINDSIGHT WOULD SAY WAS AN OVERREACTION, BUT IT IS IN SOME REGARD UNDERSTANDABLE WHY HE WOULD REACT IN A WAY THAT SEEMED SO OVER THE TOP TO PEOPLE WHO HAD A NORMAL EXPERIENCE WITH THEIR PARENTS AS A TEENAGER.

MR. MCLEOD IS A MAN WHO BY ALL ACCOUNTS IS PRETTY -- WAS EMOTIONALLY VERY IMMATURE ALL OF HIS LIFE. AT 15 HE WASN'T 15. AT 20 HE WASN'T 20. HIS EMOTIONAL UPBRINGING WAS STUNTED FROM YEARS IN A GROUP HOME AND BEING ABUSED. THOSE ARE NOT THINGS THAT CAN GET MADE UP IN THREE YEARS WITH NORMAL FOLK.

HE STRUGGLED TO FIND JOBS, TO FIND A CAREER PATH, AND TO FIND WHO HE WANTED TO BE, BUT HE DID TRY AND WORK AND BE PRODUCTIVE AND DO THE THINGS THAT HE NEEDED TO DO.

HE'S A MAN WHO HAS A CONSIDERABLE NUMBER OF PEOPLE THAT LOVE HIM AND CONSIDER HIM FAMILY. MR. DICKERSON OBVIOUSLY HE CONSIDERS HIM HIS FATHER. MR. DICKERSON'S MOTHER, TONY'S GRANDMOTHER, WAS THE ONLY MOTHER FIGURE HE'S EVER REALLY KNOWN. HIS PARTNER ERIC OF MORE THAN SEVEN YEARS IS HERE TODAY WITH HIS MOM, TONY'S IN-LAWS. HE HAS NIECES AND NEPHEWS FROM ERIC'S BROTHERS AND SISTER. PEOPLE JUST ADORE HIM, WHO KNOW HIM TO BE A KIND AND GENTLE SOUL, WHO TENDS TO ERR ALWAYS ON THE SIDE OF HELPING PEOPLE. THAT'S WHO THEY ALL KNOW HIM TO BE. THAT'S

WHO HE HAS BEEN.

MR. MCLEOD WENT BACK TO SCHOOL. HE WENT TO THE POLICE ACADEMY BECAUSE HE WANTED TO BE IN A POSITION TO HELP FOLKS. HE STRUGGLED TO FIND A JOB. HE WAS STRUGGLING IN HIS CAREER, AND THAT'S KIND OF WHAT LED TO -- YOU HEARD MR. WOLFE TALK ABOUT THE BREAKDOWN IN THE RELATIONSHIP AND TONY'S ESCAPE INTO VIDEO GAMES, WHICH I THINK IN SOME REGARDS SHOWS HIS KIND OF EMOTIONAL MATURITY AT THAT TIME, TOO, INSTEAD OF, YOU KNOW, KIND OF PULLING UP HIS BOOTSTRAPS AND BEATING THE BUSHES, HE ESCAPED. HE ESCAPED FROM HIS REALITY, WHICH MANY OTHER PEOPLE DID.

15 YEARS IS A SUFFICIENT SENTENCE TO PUNISH MR. MCLEOD AND TO ASSURE THE SAFETY OF THE COMMUNITY. I ADDRESSED IN MY PAPERS THE GUIDELINES IN THIS CASE, AND IN SOME REGARD WHY I THINK THE GUIDELINES YIELD A SENTENCE THAT IS SO MUCH GREATER THAN WHAT'S TRULY NECESSARY, ESPECIALLY -- INTERESTINGLY, THE GUIDELINES THAT ARE DRIVING THIS CASE ARE THE PRODUCTION OF CHILD PORNOGRAPHY GUIDELINES. THOSE ARE THE GUIDELINES THAT ARE HIGHER UNDER ANY CALCULATION OF THE GUIDELINES, WHETHER OR NOT THE COURT APPLIES THE ENHANCEMENTS SUGGESTED BY PROBATION OR THE GOVERNMENT OR WHETHER THEY DON'T. THE CHILD PORNOGRAPHY GUIDELINES ARE WHAT ARE DRIVING THE CASE. WHILE I DON'T -- AND THOSE ARE THE COUNTS TO WHERE THE 15-YEAR MINIMUM MANDATORY APPLIES.

WHAT WE KNOW AND WHY CHILD PORNOGRAPHY PRODUCTION

CASES, AND POSSESSION CASES, AND DISTRIBUTION CASES ARE TREATED
SO HARSHLY IS BECAUSE OF THE FEAR OF ONGOING HARM. WE TALK A
LOT ABOUT THE RE-VICTIMIZATION OF PEOPLE BECAUSE THE IMAGES ARE
POSTED ONLINE AND THEY CAN NEVER GO AWAY. THAT DIDN'T HAPPEN
HERE. IN THE SPECTRUM OF CHILD PORNOGRAPHY PRODUCTION CASES,
THIS ONE IS ON THE MORE BENIGN SIDE OF THE SPECTRUM, AND I
THINK THE COURT KNOWS THAT FROM OTHER CASES THEY'VE TRIED AND
OTHER CASES THEY'VE SEEN.

I'M NOT SAYING THIS IS NOT A SERIOUS OFFENSE, BUT WE'RE
TALKING ABOUT A PRODUCTION CASE IN WHICH THE SAME MINIMUM
MANDATORY APPLIES TO MR. MCLEOD WHOSE CONVICTION ON PRODUCTION
RESULTED FROM CONDUCT FROM 3,000 MILES AWAY HE TRADED IMAGES
WITH A 14-YEAR OLD WHO TOOK PHOTOGRAPHS AND MADE VIDEOS
HIMSELF. THAT IS HOW THIS PORNOGRAPHY WAS PRODUCED.

I'M NOT AT ALL SAYING THAT THAT'S NOT SERIOUS, BUT IT
IS UNDER THE GUIDELINES AND UNDER THE -- UNDER THESE GUIDELINES
NO DIFFERENT, AND UNDER THE MINIMUM MANDATORY, THE SAME MINIMUM
MANDATORY GUIDELINES APPLY TO THAT AS IF HE BEEN IN THE SAME
ROOM WITH JOHNATHAN AND FORCED HIM TO HAVE SEX WHILE FILMING
IT, THE SAME GUIDELINES AND THE SAME 15-YEAR MINIMUM MANDATORY
WOULD APPLY.

SO WHEN WE'RE TALKING ABOUT THE NATURE AND
CIRCUMSTANCES OF THIS OFFENSE, THIS IS ON THE MORE -- LESS
SIGNIFICANT SIDE OF A CHILD PORNOGRAPHY OFFENSE. THESE IMAGES
BY ALL ACCOUNTS WERE NEVER DISTRIBUTED, WERE NEVER INTENDED FOR

DISTRIBUTION.  THE IMAGES WERE ALL RECOVERED FROM JOHNATHAN'S

PHONE.  MR. MCLEOD -- THEY SEARCHED EVERY DEVICE IN HIS HOME,

EVERY COMPUTER HE HAD ACCESS TO, THERE WAS NO INDICATION THAT

ANY OF THESE IMAGES WERE EVER PUBLISHED, SHARED, AND I THINK

THAT DOES MINIMIZE THE ONGOING HARM.

OBVIOUSLY, THERE IS -- I THINK THE COURT BROUGHT THIS

UP IN TERMS OF CALCULATING THE GUIDELINES INITIALLY -- SOME

LEVEL OF HARM JUST IN THE CREATION OF THE IMAGES, PERIOD, BUT

WE ARE TALKING ABOUT A TEENAGER, NOT A FOUR-YEAR-OLD.  WE ARE

TALKING ABOUT SOMEONE WHO IS 14, WHO IS CAPABLE OF MAKING

CERTAIN LEVELS OF DECISIONS THEMSELVES, AND I'M NOT -- AND WHEN

I SAY THAT I'M NOT SAYING THAT TO BLAME JOHNATHAN IN ANY

CAPACITY, BUT HE IS AND WAS A YOUNG MAN WHO MADE SOME CHOICES

THERE.

WHETHER HE MADE CHOICES BECAUSE HE WAS INFLUENCED BY

SOMEONE ELSE OR ENCOURAGED BY SOMEONE ELSE IS A DIFFERENT

DISCUSSION, BUT THAT IS A VERY DIFFERENT SITUATION THAN A CHILD

WHO IS SO YOUNG THAT THEY DON'T EVEN UNDERSTAND THE SEXUAL

NATURE OF THINGS, AND THAT'S WHY I THINK THESE PRODUCTION

COUNTS ARE SUCH THAT THE MINIMUM MANDATORY IS SUFFICIENT

BECAUSE THIS IS NOT A VICTIM WHO HAD NO IDEA OF THE SEXUAL

NATURE OF THIS, COULD NOT MAKE ANY DETERMINATION, AND WAS

ENTIRELY FORCED.

THIS WAS SOMEONE WHO WAS 3,000 FILES AWAY FROM THE

PERSON WHO WAS ENCOURAGING, WITHOUT CONCEDING -- OBVIOUSLY, I'M

NOT CONCEDING ANYTHING, BUT UNDER THE FACTS PRESENTED OR UNDER THE THEORY OR THE CONVICTION WAS 3,000 MILES AWAY FROM THE PERSON ENCOURAGING THE PRODUCTION, AND I THINK THAT COUNSELS TOWARD A MUCH MORE -- TOWARDS A MINIMUM MANDATORY.

I THINK THAT'S ESPECIALLY TRUE WHEN WE LOOK AT THE FACT THAT RIGHTLY OR WRONGLY SEXTING IS A TEENAGE PHENOMENON RIGHT NOW.  TEENAGERS SEXTING WITH ONE ANOTHER, PERIOD, IS SOMETHING THAT IS HAPPENING DAILY.  IT IS KIND OF NOW TALKED ABOUT IN HIGH SCHOOLS, AND STUDIES ARE DONE BECAUSE OF THE ACCESSIBILITY OF SMARTPHONES.  THE IDEA OF SEXTING SOMEONE, SENDING SEXUALLY EXPLICIT PHOTOGRAPHS TO ANOTHER HUMAN BEING, IS NOT SOMETHING THAT ANY OF US COULD HAVE OR WOULD HAVE OR EVER THOUGHT ABOUT DOING, BUT WE DIDN'T HAVE INSTAGRAM.  WE DIDN'T HAVE SNAPCHAT. WE DIDN'T HAVE FACEBOOK.

WE DIDN'T HAVE A SMARTPHONE THAT WOULD ALLOW ME TO TAKE A PICTURE OF ANYBODY, AT ANYTIME, IN A SPLIT MOMENT, AND ALLOWS TEENAGERS TO KIND OF ACT ON THOSE IMPULSES THAT TEENAGERS HAVE, IN THE WAY THAT TEENAGERS DON'T THINK ABOUT "WHAT'S THIS GOING TO LOOK LIKE 15 YEARS FROM NOW" OR "AM I GOING TO REALLY HAVE WANTED THIS ON MY FACEBOOK WHEN I'M IN COLLEGE?"

AND WE CITED -- IN MY PAPERS I CITED THAT STUDY IN 2012 SAYING THAT AT LEAST 28 PERCENT OF TEENAGERS, THAT'S ALMOST A THIRD OF THEM, HAVE ADMITTED TO SENDING PHOTOGRAPHS TO ONE ANOTHER.  THIS IS NOT SOMETHING THAT IS SO UNCOMMON OR SO UNHEARD OF THAT ONE COULD SAY THIS BEHAVIOR WOULD NEVER HAVE

HAPPENED HAD MR. MCLEOD NOT BEEN INVOLVED.  MAYBE, MAYBE NOT,
BUT I DO ALSO THINK THAT THAT MITIGATES THIS HARM, IN TERMS OF
WHEN WE'RE LOOKING AT HARM THAT WAS CAUSED AND WHAT IS
SUFFICIENT TO PUNISH MR. MCLEOD FOR THAT HARM.

MR. MCLEOD'S FAMILY IN GRAVE DETAIL SENT LETTERS TO THE
COURT TALKING ABOUT WHAT HE MEANS TO THEM, HOW MUCH THEY LOVE
HIM, HOW MUCH THEY SUPPORT HIM.  THE FACT THAT MULTIPLE TIMES
THEY'VE FLOWN OUT HERE FROM THOUSANDS OF MILES AWAY IN A CASE
WHERE, IN MY YEARS OF DOING THIS, IT'S OFTEN THE CASE WHEN
SOMEONE IS CHARGED WITH SOMETHING LIKE THIS THE FAMILY
DISAPPEARS.  ITS JUST TOO DIFFICULT.  PEOPLE RUN AWAY.  PEOPLE
GET DIVORCED.  BUT THEY'VE MAINTAINED THEIR LOVE FOR HIM
REGARDLESS, AND I THINK THAT SHOWS WHO HE WAS TO THEM -- NOT
ONLY WHO HE IS TO THEM, BUT WHO HE WILL ALWAYS BE TO THEM.

DR. CLIPSON, HAVING MET WITH MR. MCLEOD FOR A VERY --
MULTIPLE INTERVIEWS, AND PERFORMED LOTS OF TESTS, FINDS THAT
MR. MCLEOD IS A LOW TO MODERATE RISK TO REOFFEND.  HE IS NOT A
PEDOPHILE.  HE DOES NOT HAVE A SEXUAL INTEREST IN CHILDREN.
AND I KNOW BECAUSE HE'S CONVICTED OF CHILD PORNOGRAPHY AND
TRAVEL FOR A MINOR THAT MAY SEEM AT ODDS, BUT I THINK IT
ACTUALLY JUST COMES FROM THE PSYCHOLOGICAL DEFINITION OF
PEDOPHILIA, WHICH REQUIRES AN INTEREST IN PREPUBESCENT
CHILDREN, AND THAT'S NOT WHAT WE HAVE HERE.  WE HAVE
POST-PUBESCENT INDIVIDUALS.

15 YEARS FOR SOMEONE WHO HAS NEVER BEEN IN PRISON

BEFORE IS A VERY, VERY SIGNIFICANT SENTENCE, AND THAT'S GOING

TO BE FOLLOWED BY A TERM OF SUPERVISED RELEASE UP TO AND

INCLUDING THE REST OF MR. MCLEOD'S NATURAL LIFE.  SUPERVISED

RELEASE, AS THE COURT IS WELL AWARE, IS NOT SUMMARY PROBATION.

IT'S NOT JUST LIKE CHECK IN ONCE A WEEK OR ONCE A MONTH AND GO

ABOUT YOUR LIFE AND DON'T GET ARRESTED AGAIN.  SUPERVISED

RELEASE FOR SOMEONE CONVICTED OF AN OFFENSE LIKE THIS IS A VERY

SIGNIFICANT CURTAILMENT OF THEIR LIBERTY.  AND THAT, IN

CONNECTION WITH THE 15-YEAR MINIMUM MANDATORY, IS SUFFICIENT TO

PROTECT THE PUBLIC.  WHEN WE LOOK AT A 15-YEAR SENTENCE, PLUS

THIS TERM OF SUPERVISED RELEASE, IT'S NOT AS THOUGH MR. MCLEOD

IS GOING TO WALK OUT OF THE PRISON DOOR AND IT'S GOING TO BE,

"OKAY, WELL, JUST DON'T GET ARRESTED AGAIN AND WE'LL SEE YOU."

HE'S GOING TO BE SUBJECT TO GPS MONITORING, MONITORING WITH ALL

OF THOSE DEVICES.  AND LET'S BE FRANK, I'LL PROBABLY BE HERE --

WHEN THAT HAPPENS, SOMEONE WILL BE HERE AND HAVING A HEARING

ABOUT HOW THOSE THINGS HAVE CHANGED AND HOW THE TECHNOLOGY HAS

CHANGED IN BETWEEN NOW AND THEN, BECAUSE IF WE THINK ABOUT

WHERE WE WERE 15 YEARS AGO, 15 YEARS AGO I DIDN'T HAVE A CELL

PHONE, LET ALONE A SMARTPHONE.  THERE WAS NO COVERAGE WHERE I

LIVED AT THE TIME.  NOBODY HAD CELL PHONES.

TODAY WE HAVE NOT JUST A CELL PHONE, WE HAVE WHAT IS IN

FACT A COMPUTER IN OUR HAND, WHERE I BANK, AND THINGS THAT I

COULDN'T EVEN HAVE THOUGHT I WOULD BE DOING ON MY PHONE

15 YEARS AGO, WE DO ON OUR PHONE NOW.  SO THE WAY THAT

1    TECHNOLOGY WILL HAVE CHANGED AND IMPROVED, JUST LOOKING AT THE

2    LAST 10 YEARS HOW GPS MONITORING HAS CHANGED AND IMPROVED, IT

3    GIVES THE PEOPLE THE ABILITY TO MONITOR SOMEONE WITH GPS

4    EFFICIENTLY, EFFECTIVELY AND SOMEWHAT MORE -- SURREPTITIOUSLY

5    IS THE WORD THAT COMES TO MIND, BUT LESS INVASIVELY BECAUSE IT

6    USED TO BE YOU HAD THIS HUGE BAG YOU HAD TO CARRY AROUND.  IT

7    WAS VERY OBVIOUS WHEN SOMEONE WAS ON GPS MONITORING, AND NOW

8    WE'RE DOWN TO A LITTLE ANKLET, SO FLASH FORWARD 13 YEARS WE'RE

9    GOING TO BE ABLE TO DO EVEN MORE.

10            MR. MCLEOD IS A PERSON WHO DIDN'T BREAK THE LAW.  HE

11   WAS A LAW-ABIDING CITIZEN WHO DOESN'T HAVE A HISTORY OF ANY

12   KIND OF CONVICTIONS.  THERE WERE -- I UNDERSTAND THAT THERE'S

13   SOME ARREST ISSUES WITH DOMESTIC DISPUTES, BUT NO CHARGES WERE

14   EVER BROUGHT.  MR. WOLFE IS HERE.  HE ISN'T A GUY WHO HAD EVER

15   BEEN IN JAIL BEFORE THIS CASE, AND HE'S NOW BEEN IN CUSTODY

16   SINCE JUNE OF 2013, UNDERSTANDS NOW THAT HE'S FACING

17   SUBSTANTIALLY MORE YEARS.

18            I KNOW THAT THE GOVERNMENT'S POSITION ON THIS CASE, AND

19   REALLY THEIR REQUEST FOR 33-PLUS YEARS IS BASED ON A NOTION

20   THAT THEY NEED TO PROTECT THE PUBLIC FROM MR. MCLEOD.  15 YEARS

21   IS SUFFICIENT TO DO THAT.  15 YEARS MEANS THAT HE'S GOING TO BE

22   ALMOST 50 WHEN HE COMES OUT OF PRISON.  WHAT WE KNOW, WHAT IS

23   BEYOND DISPUTE, IS THAT RECIDIVISM RATES FOR ANY INDIVIDUAL

24   DROPS AS THEY AGE.  THAT IS WIDELY ACCEPTED WITHIN THE

25   COMMUNITY.  IT IS KIND OF THE NATURE OF EVERY STUDY THAT'S EVER

1    BEEN DONE IS THAT AS PEOPLE AGE THEY COMMIT LESS CRIMES.  47,

2    WHILE FAR FROM BEING OLD, IS STARTING DOWN THE PATH OF WHEN

3    PEOPLE ARE LESS LIKELY TO RECIDIVATE.

4         THIS IS A CASE WHERE OBVIOUSLY IT WAS SERIOUS, AND

5    OBVIOUSLY NO ONE IS DISPUTING THE HARM THAT WAS CAUSED TO

6    EVERYONE.  THE QUESTION IS WHAT IS SUFFICIENT TO PUNISH MR.

7    MCLEOD AND THEN TO MEET THE OTHER PURPOSES OF SENTENCING, WHICH

8    ARE REHABILITATION, TREATMENT, EDUCATION, SOME OF WHICH CAN BE

9    ACCOMPLISHED IN THE BUREAU OF PRISONS, BUT SOME OF WHICH JUST

10   CAN'T.

11        MR. MCLEOD WILL INEVITABLY BE PLACED IN A SEX OFFENDER

12   MANAGEMENT PROGRAM OR TREATMENT PROGRAM THAT HE'LL BE ALLOWED

13   TO COMPLETE WHILE IN THE CUSTODY OF THE BUREAU OF PRISONS, BUT

14   HIS TRUE REHABILITATION IS NOT GOING TO HAPPEN WITHIN THE

15   PRISON WALLS BECAUSE REHABILITATION IS GEARED TOWARD LIVING IN

16   THE OUTSIDE WORLD WITH OTHER PEOPLE, RIGHT?  IT'S VERY EASY TO

17   SAY SOMEONE IS REHABILITATED WHEN THEY CANNOT LEAVE A PRISON.

18   THE QUESTION IS HOW THEY FUNCTION ON THE OUTSIDE, AND THAT'S

19   GOING TO CONTINUE WHILE HE'S ON SUPERVISED RELEASE.

20        HE IS GOING TO HAVE TO RETHINK ANY CAREER PATH HE HAD,

21   AS HE'S NOW GOING TO BE A CONVICTED FELON AND A REGISTERED SEX

22   OFFENDER, WHICH WILL DRAMATICALLY DECREASE A LOT OF JOB

23   PROSPECTS.  THE COURT KNOWS THAT.  THOSE ARE JUST COLLATERAL

24   CONSEQUENCES OF THE NATURE OF THESE TYPES OF CONVICTIONS.

25        SO HE'S GOING TO HAVE TO FIND A NEW EDUCATIONAL PATH,

1    DO SOME KIND OF JOB TRAINING.  HIS OPPORTUNITIES FOR THAT ARE

2    VERY LIMITED IN THE BOP.  THERE ARE COLLEGE PROGRAMS AND THINGS

3    LIKE THAT.  HE WILL TAKE ADVANTAGE OF THOSE TO THE BEST THAT HE

4    CAN, AND THE BEST THAT HE CAN AFFORD, BECAUSE ANY COLLEGE

5    CLASSES THAT HE TAKES IN CUSTODY YOU HAVE TO PAY FOR, AND HE

6    DOESN'T COME FROM A FAMILY OF INCREDIBLE MEANS, BUT HE KNOWS

7    THAT, AND HE WILL WORK TOWARDS THOSE GOALS AND WORK TOWARDS

8    COMING OUT OF PRISON IN SUCH A WAY THAT HE CAN REINTEGRATE MOST

9    SUCCESSFULLY.

10        15 YEARS IS NOT GOING TO RESULT IN AN UNWARRANTED

11   DISPARITY OF SENTENCINGS IN THIS TYPE OF CASE.  I CITED SEVERAL

12   OTHER CASES IN MY PAPERS IN TERMS OF SIMILARLY-SITUATED FOLKS

13   AND THE SENTENCES THAT THEY RECEIVED, AND MOST OF THEM RECEIVED

14   FAR LESS THAN THE 15-YEAR MANDATORY MINIMUM.  THE CASES THAT

15   INVOLVED THAT -- I CITED THREE OTHER CASES THAT THE DEFENDANTS

16   RECEIVED A SENTENCE OF 210 MONTHS, WHICH IS JUST 30 MONTHS MORE

17   THAN MR. MCLEOD IS REQUESTING, BUT INVOLVED CONDUCT THAT WAS

18   SUBSTANTIALLY MORE EGREGIOUS, BY ANY STRETCH OF THE

19   IMAGINATION.  THE KIDNAPPING AND ORAL COPULATION OF A 5-YEAR

20   OLD BOY.  THE IMAGES OF A DEFENDANT MOLESTING HIS 5-YEAR OLD

21   DAUGHTER, AND IMAGES OF A DEFENDANT MOLESTING HIS 7-YEAR OLD

22   NIECE, AND THOSE CASES RESULTED IN A SENTENCE OF 210 MONTHS.  I

23   THINK THOSE CASES CERTAINLY ARE A MUCH MORE EGREGIOUS SET OF

24   FACTS THAN WHAT WE HAVE HERE.

25        I GUESS THE ONE THING I HAVEN'T TOUCHED ON IS THAT I

1    GUESS MAYBE WHAT IS ONE OF THE CONCERNING ELEMENTS OF THIS

2    CASE, THAT ISN'T LOST ON ANYONE, IS THAT THERE WAS A PERIOD OF

3    14 HOURS WHERE MR. -- WHERE JOHNATHAN'S PARENTS DID NOT KNOW

4    WHERE HE WAS, AND THAT'S A TRUE FACT, RIGHT, THAT'S A THING

5    THAT RESULTED FROM TRIAL, AND THAT IS SOMETHING THAT MR. MCLEOD

6    NOW UNDERSTANDS WAS INCREDIBLY HARMFUL AND INCREDIBLY DAMAGING

7    FOR THAT FAMILY, HOW SCARED SHE MUST HAVE BEEN -- HOW SCARED

8    MS. RAMIREZ MAY HAVE BEEN, AND HOW UPSET, AND HOW DIFFICULT

9    THAT WAS FOR HER, AND OBVIOUSLY THAT IS PART OF THE CALCULUS IN

10   WHAT IS SUFFICIENT TO PUNISH MR. MCLEOD.

11        I KNOW IN HER -- I ADDRESSED THIS, FRANKLY, JUST

12   BECAUSE IT'S FACTUAL, BUT IN MS. RAMIREZ'S VICTIM IMPACT

13   STATEMENT SHE MENTIONED HAVING SEEN A CAR IN HER NEIGHBORHOOD

14   THE NIGHT BEFORE JOHNATHAN WENT MISSING AND BELIEVING -- TODAY

15   SHE BELIEVES THAT THAT CAR WAS MR. MCLEOD.  THE FACT OF THE

16   MATTER IS MR. MCLEOD WASN'T IN SAN DIEGO YET, HADN'T PICKED UP

17   HIS RENTAL CAR YET.  HE WAS STILL IN LOS ANGELES.  I UNDERSTAND

18   WHY IN HINDSIGHT A PERSON MIGHT BEAT THEMSELVES UP BY SAYING,

19   "WOW, I SAW THIS CAR.  I COULD HAVE DONE SOMETHING TO STOP

20   THAT."  THAT'S JUST NOT -- SHE SHOULDN'T PUT THAT BLAME ON

21   HERSELF TO EVEN THINK THAT BECAUSE THAT DIDN'T HAPPEN.

22        MR. MCLEOD DIDN'T STALK HER HOUSE, DIDN'T KNOW WHERE

23   SHE WAS.  IN FACT, HE HADN'T EVEN PICKED UP THE RENTAL CAR AT

24   THAT TIME.  THERE'S NO EVIDENCE THAT HE WAS EVER IN SAN DIEGO,

25   SO TO THE EXTENT THAT MS. RAMIREZ IS FAULTING HERSELF IN NOT

STOPPING IT, I SUPPOSE I WANT HER TO KNOW THAT'S TRUE, BUT ALSO MR. MCLEOD WASN'T STALKING THE FAMILY, WASN'T DRIVING BY THEIR HOUSE, CIRCLING, TO TRY AND PICK UP JOHNATHAN, THAT THAT DIDN'T HAPPEN.  OBVIOUSLY, HE DID MAKE ARRANGEMENTS TO PICK UP JOHNATHAN FROM HIS MIDDLE SCHOOL.  THAT HAPPENED, AND MR. MCLEOD, REGARDLESS OF WHAT OTHER INTENT, HE DID BELIEVE THAT JOHNATHAN WAS BEING ABUSED.  I THINK THAT WAS CLEAR FROM THE POST-ARREST STATEMENT.  WE KNOW THAT WAS DEFINITELY WHAT JOHNATHAN WAS TELLING HIM.

THE REST OF IT, OBVIOUSLY WE WENT TO TRIAL, AND THERE WAS A TRIAL ABOUT ANY FURTHER INTENT OR ADDITIONAL INTENT, BUT IT WAS NEVER CHALLENGED THAT MR. MCLEOD DID BELIEVE THAT JOHNATHAN WAS SUFFERING AT THE HANDS OF HIS PARENTS, THAT HE WAS NOT BEING TREATED WELL BECAUSE, IN MR. MCLEOD'S MIND, WHAT HE WAS TOLD IS BECAUSE JOHNATHAN WAS SAYING HE WAS GAY OR THEY BELIEVED HE WAS GAY, AND THEY WERE MISTREATING HIM BECAUSE OF THAT.

OBVIOUSLY, NO ONE IS SAYING THAT EXCUSES ANY KIND OF BEHAVIOR, BUT IT DOES MITIGATE MR. MCLEOD'S STATE OF MIND.  HE DID CALL CPS.  HE DID MAKE CALLS TO THE POLICE DEPARTMENT.  I DON'T THINK WE ACTUALLY PUT INTO EVIDENCE THE RECORDED CALL TO CPS, BUT THERE WAS ONE, AND I THINK THAT THAT'S NOT DISPUTED BY ANY SIDE.

AGAIN, THIS ISN'T TO SAY THAT ANY OF THIS WAS JOHNATHAN'S FAULT.  IT IS TO PUT THE CONTEXT OF ALL OF THE

OFFENSE IN -- TO PUT ALL OF THE OFFENSE IN CONTEXT THAT THAT
WAS GOING ON.

I KNOW THAT IN PRETRIAL HEARINGS THE COURT MENTIONED
*WYLY* A LOT, AND WE ALL DID IN TERMS OF SETTING THINGS UP, AND I
DO THINK THAT IN SOME REGARDS LOOKING AT THIS CASE IN
COMPARISON WITH THAT CASE, FOR SENTENCING PURPOSES, MAKES SOME
SENSE, SO THEY WERE IN SOME REGARDS VERY DIFFERENT, AND THOSE
DEFENDANTS WERE VERY DIFFERENT, BUT IN THAT CASE THERE WERE
VERY GRAPHIC IMAGES.  THIS PERSON WAS A CAREGIVER FOR THIS
CHILD.  THE CHILD WAS 6 YEARS OLD.  MS. WYLY RECEIVED A
SENTENCE OF 27 YEARS, WHICH IS ALMOST EIGHT YEARS LESS THAN
WHAT THE GOVERNMENT IS RECOMMENDING IN THIS CASE.

HERE, THERE WAS NO FORCE.  THERE WAS NO DISTRIBUTION OF
IMAGES.  UNDERSTANDABLY, YES, THERE IS SOME -- NOBODY IS
DISPUTING THAT THERE WAS HARM TO THE FAMILY, BUT WE DID HAVE
TEENAGERS INVOLVED IN THIS OFFENSE, TEENAGERS WHO WERE 3,000
MILES AWAY FROM MR. MCLEOD, WHO REGARDLESS OF -- THIS ISN'T TO
SAY IT'S THEIR FAULT OR I'M NOT BLAMING THEM IN ANY CAPACITY,
BUT AT ANY POINT THEY COULD HAVE HUNG UP THEIR IPADS, BUT THEY
DIDN'T.  EXACTLY WHY THAT IS, WE DON'T KNOW, BUT THAT IS A VERY
DIFFERENT PERSON -- A 14-YEAR OLD 3,000 MILES AWAY WITH AN
ELECTRONIC DEVICE IS VERY DIFFERENT THAN A 4 OR 5-YEAR OLD IN
THE SAME ROOM WITH SOMEONE, VERY DIFFERENT THAN A CHILD WHO IS
TOO YOUNG TO EVEN UNDERSTAND ANYTHING ABOUT SEXUAL NATURE OR
PRIVACY, OR ANY OF THAT, BEING FORCED TO DO SOMETHING BY

1    SOMEONE WHO IS THEIR CAREGIVER OR HAS LIMITED CONTACT WITH

2    THEM, AND FOR ALL OF THOSE REASONS, AND BECAUSE OF ALL OF THE

3    HISTORY AND CHARACTERISTICS OF MR. MCLEOD LAID OUT IN OUR

4    SENTENCING MEMORANDUM, AND IN OUR LETTERS, I DO BELIEVE THAT A

5    SENTENCE OF 15 YEARS IS SUFFICIENT TO MEET THE PURPOSES OF

6    SENTENCING IN THIS CASE, ESPECIALLY WHEN YOU COUPLE THAT WITH

7    -- I KNOW THE GOVERNMENT IS ASKING FOR A LIFETIME OF SUPERVISED

8    RELEASE.  I THINK 20 YEARS IS SUFFICIENT.  DEPENDING ON THE

9    COURT'S CUSTODIAL SENTENCE, THE LENGTH OF SUPERVISION WE'RE NOT

10   GOING TO DICKER WITH -- WE'LL BE OKAY WITH.  AND WITH THAT, I

11   WOULD SUBMIT ON ALL OF OUR SUBMISSIONS AND ASK FOR A 15-YEAR

12   SENTENCE.

13            THE COURT:  THANK YOU.

14            MR. MCLEOD, YOU HAVE AN OPPORTUNITY TO ADDRESS THE

15   COURT, SAY ANYTHING YOU WOULD LIKE TO SAY THIS MORNING.  YOU

16   DON'T HAVE TO SAY ANYTHING OR YOU MAY, SIR, IT'S UP TO YOU.

17            THE DEFENDANT:  IS THAT SOMETHING YOU WOULD LIKE FOR ME

18   TO DO AT THIS TIME?

19            THE COURT:  IF YOU WISH TO MAKE A STATEMENT, NOW WOULD

20   BE THE TIME.

21            I ALSO WANT TO ASK DOES ANYBODY ELSE WISH TO ADDRESS

22   THE COURT ON BEHALF OF MR. MCLEOD?

23            MS. MORGAN:  YES, YOUR HONOR, MR. WOLFE AND MR.

24   DICKERSON, AS WE PREVIOUSLY INDICATED TO THE COURT, WOULD LIKE

25   TO ADDRESS THE COURT.  I THINK THE REASON WHY MR. MCLEOD IS

1    ASKING IF YOU WANT HIM TO ADDRESS YOU NOW IS BECAUSE IN OTHER

2    SENTENCINGS I'VE HAD GENERALLY THE DEFENDANT'S ALLOCUTION IS

3    ONE OF THE LAST THINGS THAT'S HAPPENED, WHEN I EXPLAINED HOW

4    THINGS WOULD HAPPEN.  IT'S FINE.

5         THE COURT:  MY PRACTICE AND CUSTOM IS AFTER DEFENSE

6    COUNSEL TO HEAR FROM ANYBODY ELSE FOR THE DEFENSE, NAMELY, THE

7    DEFENDANT AND ANYBODY ELSE WHO WISHES TO SPEAK.

8         IF YOU WOULD LIKE TO GO BEFORE THE OTHER SPEAKERS, MR.

9    MCLEOD, YOU MAY, OR YOU COULD GO AFTER THEM.  PRESENT THEM

10   HOWEVER YOU WOULD LIKE, BUT NOW IS THE TIME TO HEAR IT.  THEN

11   THAT WILL CONCLUDE YOUR OPPORTUNITY TO ADDRESS THE COURT ON

12   ANYTHING, I'LL GO TO THE GOVERNMENT AND THEN PROBATION.

13        MS. MORGAN:  ABSOLUTELY, YOUR HONOR.  I JUST WANTED TO

14   EXPLAIN WHY THERE WAS SOME CONFUSION.

15        THE COURT:  THAT'S OKAY.  GO AHEAD, WHOEVER WISHES TO

16   GO FIRST.

17   (DISCUSSION HELD OFF THE RECORD.)

18        THE COURT:  DO YOU NEED A BREAK?

19        MS. MORGAN:  WE NEED A COMFORT BREAK, YOUR HONOR.

20        THE COURT:  WE NEED A BRIEF BREAK.  LET'S TAKE A FIVE,

21   10-MINUTE RECESS, KEEP IT AS SHORT AS WE CAN.  THANK YOU.

22   (COURT WAS AT RECESS.)

23        THE COURT:  MS. MORGAN, IF MR. MCLEOD WOULD LIKE TO

24   ADDRESS THE COURT OR IF EITHER OF THE TWO OTHER INDIVIDUALS

25   WISH TO ADDRESS THE COURT, NOW IS THE TIME TO DO IT.

1      MS. MORGAN:  MR. MCLEOD IS PREPARED TO SPEAK FIRST,

2  YOUR HONOR.  THANK YOU.

3      THE COURT:  CERTAINLY.

4      PLEASE COME FORWARD, MR. MCLEOD, TO THE PODIUM, SIR.

5      THE DEFENDANT:  YOUR HONOR, I APPRECIATE THE

6  OPPORTUNITY TO SPEAK TO THE COURT.  I KIND OF WISH THAT THERE

7  WAS DIFFERENT OPPORTUNITIES FOR THE DEFENDANT TO GET UP AND SAY

8  THINGS, AND AT SENTENCING IT SEEMS TO BE THE ONLY OPPORTUNITY

9  THAT I HAVE TO SPEAK TO EVERYONE IN THE ROOM, AND I'M THANKFUL

10  THAT EVERYONE IS HERE, ALL THE FAMILY IS HERE.  I'M GRATEFUL

11  THAT MY FAMILY IS HERE.  I WANT EVERYONE TO HEAR IT ALL AT THE

12  SAME TIME.  I'M GLAD I HAVE THIS OPPORTUNITY TO ADDRESS

13  EVERYONE AND SAY WHAT NEEDS TO BE SAID.

14      I WOULD LIKE TO THANK MY FAMILY FOR COMING.  THE COURT

15  KNOWS THEY CAME FROM FLORIDA.  THANK YOU.  I LOVE YOU FOR

16  COMING.  I'M SO GRATEFUL FOR YOU TO BE HERE.  THANK YOU.

17      THE FAMILY ON THE GOVERNMENT SIDE, JOHNATHAN AND MAX,

18  AND YOUR FAMILY, YOU KNOW, I'M GLAD YOU'RE HERE BECAUSE I OWE

19  YOU THE LARGEST APOLOGY FOR MY INVOLVEMENT.  I MADE AN

20  IMMATURE, POOR CHOICE, AND YOU GUYS AND YOUR FAMILY, AND THE

21  FAMILY THAT'S NOT HERE TODAY, THAT HAS HAD AN IMPACT -- ON A

22  POOR DECISION THAT I HAD MADE HAS BEEN INFLUENCED BY THIS AND I

23  AM DEEPLY AND TRULY SORRY.  I OWN THAT, AND THERE IS NOTHING I

24  CAN SAY -- THERE ARE NO WORDS THAT I CAN ARTICULATE TO ERASE

25  THE LAST 30 MONTHS OF WHAT YOU MUST HAVE THOUGHT OF ME OR YOU

1    MUST THINK OF ME THROUGHOUT THE COURSE OF THIS PROCESS.

2         IF YOU ONLY KNEW, IT WOULD CHANGE SOME THINGS, BUT

3    WE'RE NOT HERE FOR THAT.  BUT I DO WANT YOU GUYS TO TAKE AWAY,

4    IF ANYTHING, THAT I RECOGNIZE THAT MY INVOLVEMENT IN THIS

5    SITUATION HAS DEEPLY AND TRULY AND FOREVER, NO MATTER IF I GO

6    HOME RIGHT NOW OR IF I GO HOME IN 33 YEARS, IT CANNOT BE ERASED

7    THE IMPACT THAT THE DECISION HAS INFLUENCED UPON THE FAMILY FOR

8    THE REST OF YOUR LIVES.

9         I DON'T KNOW IF THESE WORDS ARE COMFORTING.  I WOULD

10   LIKE FOR THEM TO BE, BUT I THANK EVERYONE WHO DID COME TO HEAR

11   THESE WORDS AND TO HOPEFULLY UNDERSTAND SOME OF THE

12   CIRCUMSTANCES THAT WERE COMMUNICATED BY MY ATTORNEY AND HOPE

13   THAT THAT SHEDS SOME LIGHT INTO A LITTLE MORE ABOUT ME.

14        I'M SORRY TO EVERYONE ELSE IN THIS ROOM FOR THE

15   DECISION.  THESE FOLKS HERE HAVE SPENT COUNTLESS HOURS TRYING

16   TO WORK THIS THING OUT AND TRYING TO GET THROUGH THIS.  I'M

17   TERRIBLY SORRY TO THE GOVERNMENT THAT YOU HAVE LOST SLEEP OVER

18   THIS, I HAVE NO DOUBT.  YOU GUYS HAVE PROBABLY ARGUED, FUSSED,

19   FOUGHT, AND CUSSED TRYING TO WORK THROUGH THIS THING, AND I OWN

20   THE FACT THAT YOU'RE TAKING YOUR LAST 30 MONTHS AND YOU'RE

21   HAVING TO DEAL WITH THIS AND MAKE THESE APPOINTMENTS WITH THE

22   COURT BECAUSE OF A CHOICE I MADE.  IT WAS TIME OUT OF YOUR

23   LIFE, YOUR BUSY SCHEDULE, AND I HATE BEING A REASON THAT YOU'RE

24   HAVING TO OCCUPY SO MUCH OF YOUR TIME AND SO MUCH OF YOUR

25   ENERGY IN DEALING WITH THIS ISSUE.

1    I EXTEND THE SAME APOLOGIES TO MY COUNSEL BECAUSE I'M
2    HERE -- THEY HAVE TO BE HERE -- AND THE REST OF THE COURT.
3    THIS WOMAN'S POOR FINGERS FOR EIGHT DAYS OF TRIAL, I MEAN, I
4    CAN ONLY IMAGINE, AND I'M SORRY THAT I'M THE REASON THAT THIS
5    LADY WAS AT WORK FOR EIGHT DAYS AND POUNDING AWAY HER FINGERS
6    TO ADDRESS THIS CASE.

7         AND, YOUR HONOR, I CAN ONLY IMAGINE WHAT IT'S LIKE TO
8    SIT IN YOUR CHAIR AND TRY TO FIGURE THIS THING OUT, AND LISTEN
9    TO THESE ARGUMENTS, AND MAKE GOOD DECISIONS.  I DON'T THINK
10   ANYONE WINS HERE.  YOU KNOW, WE'RE ASKING FOR SOMETHING,
11   THEY'RE ASKING FOR SOMETHING, AND WHEN WE WALK AWAY FROM THIS
12   NO ONE IS GOING TO BE HAPPY, AND I KNOW THAT.  I OWN THAT.
13   WE'RE HERE TODAY BECAUSE OF A POOR CHOICE THAT I RECOGNIZE.

14        THIS 30 MONTHS THAT I'VE BEEN IN CUSTODY HAS BEEN SUCH
15   A LEARNING EXPERIENCE.  I HAVE SEEN SO MUCH, HEARD SO MUCH, AND
16   LEARNED SO MUCH.  I COME TO YOU A DIFFERENT PERSON, AND I'D SAY
17   A BETTER PERSON THAN WHEN I WAS ARRESTED.  I THOUGHT I WAS A
18   GOOD PERSON THEN AND KNEW THINGS, BUT THIS EXPERIENCE HAS
19   REALLY SHOWN ME HOW MUCH I DON'T KNOW, HOW MUCH -- HOW SOME
20   IMMATURE DECISIONS WHERE I THOUGHT I WAS MAKING -- THERE'S NOT
21   WORDS TO EXPLAIN THE LEVEL OF SORROW I HAVE IN THIS SITUATION.

22        I APOLOGIZE TO THE COURT.  YOU HAVE WORKED THROUGH THIS
23   CASE WITH US.  YOU HAVE -- WE'VE ALL GOTTEN FRUSTRATED IN HERE.
24   WE HAVE HAD BATTLE AFTER BATTLE OVER ISSUES, AND ETC., AND YOU
25   HAVE HAD TO PUT UP WITH THIS, AND I'M VERY THANKFUL THAT YOU'RE

THE PATIENT PERSON YOU'VE BEEN, AND I'M SORRY THAT MY DECISION

HAS YOU HAVING TO BE IN THIS POSITION TODAY AND MAKE AN

ULTIMATE DECISION ON ANOTHER HUMAN'S LIFE IN THE ROLE THAT YOU

HOLD.  I'M SORRY THAT I'M HERE AND YOU'RE HAVING TO DO THIS,

AND I ABSORB SO MUCH ENERGY.

IF I COULD REWRITE SOME DECISIONS AND TAKE IT BACK, AND

MAKE A COURSE CHANGE, KNOWING THIS, I WOULD DO ANYTHING TO HAVE

THAT MOMENT BACK, ANYTHING, BUT WE'RE HERE TODAY TO DEAL WITH

WHAT'S IN FRONT OF US.  I JUST WANT THE COURT TO UNDERSTAND

THAT I UNDERSTAND AND APPRECIATE THE GRAVITY OF THIS ENTIRE

SITUATION, AND THAT I AM SO REMORSEFUL FOR ALL OF THE PAIN AND

HEARTACHE THAT THIS HAS CAUSED EVERYONE, NOT JUST THE FAMILY,

MY FAMILY, THE COUNSEL IN THIS, AND THE COURT.  I RECOGNIZE THE

GRAVITY OF THAT TREMENDOUSLY, AND I THANK YOU FOR THE COURT'S

TIME.

THE COURT:  THANK YOU, MR. MCLEOD, I APPRECIATE YOUR

COMMENTS.

WHO WOULD LIKE TO GO NEXT, MS. MORGAN?

MS. MORGAN:  MR. WOLFE.

THE COURT:  OKAY.  MR. WOLF, IF YOU WOULD JUST STATE

YOUR FULL AND COMPLETE NAME, SIR.

MR. WOLF:  ERIC KENNETH WOLFE.

THE COURT:  LET'S GO AHEAD AND USE THAT MICROPHONE, MR.

WOLF.  I KNOW IT'S NOT COMFORTABLE.

MR. WOLF:  IT'S OKAY.

```
1           THE COURT:  THANK YOU.

2           MR. WOLF:  I DIDN'T WRITE YOU A LETTER.  I WANTED TO BE

3    ABLE TO SPEAK TO YOU IN THE COURTROOM.  IT'S BEEN VERY

4    DIFFICULT.

5           I DON'T WANT TO TALK ABOUT THE CASE, BUT I DO WANT TO

6    TALK ABOUT THE LIFE TONY AND I HAD TOGETHER BEFORE THIS, AND IT

7    WAS GOOD.  I MISS HIM A LOT, AND I STILL SUPPORT HIM.  HIS

8    STATEMENT, HE SAID A LOT --

9           AND GOING BACK TO OUR LIFE TOGETHER, A RESCUE MISSION,

10   TONY WENT TO WORK ONE DAY, I WAS AT HOME.  TONY CAME BACK TO

11   THE DOOR AND SAID, "GRAB THE CRATE, GRAB THE CRATE," AND HE HAD

12   THIS LITTLE BLACK AND WHITE, SKINNY DOG AND I SAID, "NO, WE ARE

13   NOT KEEPING THIS DOG.  BRING IT SOMEWHERE ELSE.  IT'S NOT

14   STAYING WITH US."  HE SAID, "WE HAVE TO KEEP IT.  WE HAVE TO

15   TAKE CARE OF THIS DOG."  AND TONY TOLD ME THE DOG WAS RUNNING

16   DOWN THE STREET AND WENT UNDERNEATH A CITY BUS, AND TONY PULLED

17   OVER, WENT UNDERNEATH THAT BUS, UNDERNEATH THIS BUS, AND

18   GRABBED THE DOG.  MY MOM NOW HAS THAT DOG.  SHE'S HAD THAT DOG

19   SINCE HE RESCUED THAT DOG.  THAT'S THE KIND OF PERSON THAT HE

20   IS.

21          WE SEE HIM OVER HERE IN RED, AND PEOPLE IN THE

22   COURTROOM MAY VIEW HIM AS AN EVIL PERSON, AS JUST THIS TERRIBLE

23   PERSON, BUT THIS PERSON RIGHT OVER HERE TO ME IS A PERSON THAT

24   HAS A LOT OF LOVE IN HIM AND A BIG PART OF MY HEART.  I THINK

25   THAT'S ALL I WANT TO SAY BECAUSE I DON'T WANT TO BREAK DOWN.
```

1    THE COURT:  I APPRECIATE YOUR COMMENTS, MR. WOLFE.

2    THANK YOU.

3    MR. WOLFE:  THANKS.

4    THE COURT:  DOES MR. DICKERSON WISH TO COMMENT?

5    MS. MORGAN:  YES.

6    THE COURT:  OKAY.

7    MR. DICKERSON:  GOOD MORNING, YOUR HONOR, MY NAME IS

8    MARK DICKERSON.

9    THE COURT:  THANK YOU, SIR.

10    MR. DICKERSON:  I MET TONY WHEN HE WAS 11 YEARS OLD,

11    QUITE A DIFFERENT PERSON THEN.  I WAS IN CHARGE OF A WILDERNESS

12    PROGRAM, A NEW EXPERIMENTAL PROGRAM IN THE STATE OF TENNESSEE

13    FOR PEOPLE WHO HAD BEEN IN THE SYSTEM FOR A LONG TIME, AND WE

14    TRIED TO TEACH THEM LIVING BEHAVIORS AND GETTING ALONG WITH

15    OTHERS AS THE BASIS OF A TREATMENT PROGRAM, SO 11 YEARS OLD.

16    HE WENT THROUGH THAT PROGRAM, AND I WENT ON TO START

17    ANOTHER ONE.  HE WAS STUDENT NUMBER ONE IN THAT PROGRAM.  I'LL

18    NEVER FORGET THE HOURS AND HOURS WE WOULD SPEND LOOKING AT CASE

19    NOTES, AND I'LL NEVER FORGET WHAT AN IMPACT HE MADE ON ME EVEN

20    AT 11 BEFORE I'D MET HIM, AND THEN WHEN HE WALKS IN THE DOOR,

21    AS AN INTERVIEW, WHAT A PRECOCIOUS YOUNG MAN.

22    WELL, FAST FORWARD, AT ALMOST 14 -- WHEN HE WAS 14,

23    ONCE AGAIN THE STRANGEST THING IN FAMILY COURT, THAT DAY I WENT

24    AND CAME HOME WITH A PARTING GIFT, CONGRATULATIONS, IT'S A

25    CHILD.  IT WASN'T VERY LONG BEFORE WE REALIZED WITH MY MOTHER

LIVING WITH ME THAT WE REALIZED THAT THIS WAS MEANT TO BE, AND
I THINK IT SHOULD BE SAID THAT TONY STAYED WITH US FROM THE
TIME HE WAS 15 FAR INTO HIS MID-20'S.  AND THEN EVEN WHEN I
TOOK A JOB BEING ON THE ROAD NONSTOP FOR TWO YEARS IN ANOTHER
LINE OF WORK, TONY AND ERIC WERE MY MOTHER'S MAIN CAREGIVERS
FOR TWO YEARS.

FROM THE TIME TONY CAME TO LIVE WITH ME, EVEN UP UNTIL
A FEW DAYS BEFORE HIS ARREST, I CAN'T REMEMBER MORE THAN A FEW
DAYS THAT WENT BY WITHOUT HE AND I COMMUNICATING, AND I DON'T
THINK HE EVER SPENT A NIGHT IN MY HOME WHERE HE DIDN'T HEAR AN
"I LOVE YOU" THE LAST THING HE HEARD BEFORE HE WENT TO BED.

NOW, I SAY ALL THAT NOT TO SAY ALL SUCH FLOWERY THINGS,
BUT AT THE END OF THE DAY I THINK I KNOW THIS PERSON MORE THAN
ANYONE, MORE THAN THE PSYCHOLOGISTS, MORE THAN THE
PSYCHIATRISTS, MORE THAN ACQUAINTANCES, FRIENDS.  I SERVED IN
MANY ROLES, BUT MY MAIN ROLE WAS DAD AND BRINGING HIM INTO A
HOME AND TRYING TO TEACH HIM THE VALUES OF A FAMILY, WHEN HE
NEVER HAD THAT, IS QUITE A JOB FROM 15 ON.  HE WOULD ALWAYS
REMIND ME THAT THAT'S WHY HE HAD TO STAY A LOT LONGER WITH ME
BECAUSE HE MISSED THE FIRST 14 YEARS.

HE AND MY MOTHER WERE VERY CLOSE.  MY MOTHER DIED
ALMOST -- A LITTLE OVER THREE YEARS AGO, AND I'LL NEVER FORGET
WHEN THE DOCTORS CAME TO US AND SAID, "SHE'S NOT LEAVING THIS
ROOM.  SHE MAY HAVE 72 HOURS," AND I'LL NEVER FORGET IT WAS
TONY AND I THAT WENT IN AND TOLD HER, AND THE BOND THAT HE HAD

WITH MY MOTHER WAS UNBELIEVABLE AS THE REAL FIRST MOTHER
RELATIONSHIP, MOTHER/GRANDMOTHER RELATIONSHIP COMBINATION, THAT
HE HAD EVER HAD.

SO ONCE AGAIN I KNOW THIS PERSON. HE HAS OVERCOME
INSURMOUNTABLE ODDS. I WAS TOLD THAT HE WOULD NEVER GRADUATE
HIGH SCHOOL. HE DID. HE WENT TO A LOCOMOTIVE PROGRAM AND
GRADUATED WITH HONORS, AND WAS A CONDUCTOR OF A RAILROAD FOR
YEARS. HE WENT TO THE POLICE ACADEMY. HE STUDIED VOCABULARY.
THIS PERSON, WHO WAS MARKED AS JUST ANOTHER PRODUCT OF THE
SYSTEM, WENT ON TO BECOME A LOVING, NURTURING, CARING PERSON.
HE IS MY ONLY FAMILY. I HAVE A SMALL FAMILY, AND HE REALLY IS
IT.

I BEG THE COURT FOR LENIENCY, NOT NECESSARILY JUST FOR
HIS SAKE BUT FOR MINE. HE'S MY ONLY FAMILY IN THE WORLD, AND
THESE LAST 30 MONTHS HAVE BEEN BEYOND ANYTHING I COULD IMAGINE.
I ASK FOR LENIENCY. I ASK THAT IF THERE'S ANY WAY THAT THE
COURT CAN HAVE HIM TO BE LOCATED IN A FACILITY AT LEAST
SOMEWHERE NEAR THE EAST COAST. 3,000 MILE TRIPS ARE VERY
DIFFICULT FOR VISITS.

BUT I JUST WANT THIS COURT TO KNOW THAT THE PERSON THAT
HAS BEEN PAINTED HERE THROUGH THE RECORDS AND OVER THE LAST
30 MONTHS IS NOT THE PERSON THAT HE IS. I HAVE SEEN HIM GROW
FROM A VERY PRECOCIOUS, CONFUSED YOUNG MAN TO THE WONDERFUL MAN
THAT HE IS TODAY. THE PERSON HE IS, AND I KNOW HIM TO BE,
COULD NOT BE FARTHER FROM WHAT HE'S BEEN PAINTED.

1    THE ONE THING I APPRECIATE IS HIS TAKING RESPONSIBILITY

2    FOR HIS ACTIONS.  THE MAIN THING I TRIED TO TEACH HIM IN ALL

3    THOSE YEARS IS BE RESPONSIBLE FOR YOUR ACTIONS.  GOOD JOB, SON.

4    THANK YOU.

5         THE COURT:  THANK YOU, MR. DICKERSON.

6         MS. MORGAN:  YOUR HONOR, JUST TO FOLLOW UP WHAT MR.

7    DICKERSON SAID, I FORGOT TO MAKE THIS ADDITIONAL REQUEST, BUT

8    WE ARE REQUESTING A DESIGNATION TO THE STATE OF FLORIDA.  THERE

9    IS AT LEAST ONE PRISON THERE THAT HAS THE REQUISITE PROGRAM,

10   AND THERE'S ALSO ANOTHER THAT IS ONLY AN HOUR OUTSIDE TAMPA.

11   SO IF THE COURT WOULD MAKE THAT RECOMMENDATION TO THE BUREAU OF

12   PRISONS.

13        THE COURT:  CERTAINLY.  THANK YOU VERY MUCH.

14        MS. KAISER.

15        MS. KAISER:  YOUR HONOR, I WAS TALKING WITH MY

16   CO-COUNSEL AND IT MAY ASSIST THE COURT IF MAYBE WE SHOULD DO

17   THE VICTIMS FIRST AND THEN I CAN SPEAK LAST.

18        THE COURT:  HOWEVER YOU WOULD LIKE TO PRESENT IT.

19   YOU'LL GET ONE OPPORTUNITY, AS THE DEFENSE DID.  YOU CAN GO

20   FIRST OR THEY MAY GO FIRST, WHICHEVER YOU PREFER, MS. KAISER.

21        MS. KAISER:  YOUR HONOR, WE'LL TALK AT THE END, BUT

22   YOUR HONOR'S HEARD A LOT FROM US.  I THINK IT'S THEIR TIME.

23        THE COURT:  THAT'S FINE.

24        MR. N. CAREY:  I'M NEIL CAREY, N-E-I-L C-A-R-E-Y.  I AM

25   MAXWELL CAREY'S FATHER AND JOHNATHAN CAREY'S UNCLE -- OR

JOHNATHAN AGUIRRE.  I APOLOGIZE.

I MUST SAY THAT THE LAST 30 MONTHS HAVE BEEN VERY
TRYING FOR OUR FAMILY.  IT'S PUT US THROUGH A LOT.  IT PUT A
LOT OF TENSION BETWEEN ME AND MY SON, OTHER FAMILY MEMBERS.  IT
STILL CURRENTLY ISN'T QUITE CORRECT, AND IT'S GOING TO TAKE
AWHILE.  WE'VE ALL CHOSEN TO DEAL WITH IT IN OUR OWN FASHIONS.
BETWEEN ME AND MY SON, DEFINITELY WE HAVE EXPERIENCED QUITE A
FEW OCCASIONS OF OUTBURSTS BETWEEN HIM AND I.  IT'S A HARD
THING FOR EITHER ONE OF US TO ACCEPT.

WITH JOHNATHAN, YOU KNOW, I DO WANT TO SPEAK TO THE
FACT THAT IF AT ANY TIME HE WAS OR THOUGHT TO BE IN AN ABUSIVE
HOME, HE ALWAYS KNEW THAT HIS UNCLE, HE COULD COME TO OUR
HOUSE.  HE SPENT PLENTY OF TIME WITH ME.

I THINK THE ACTIONS OF TONY WERE INEXCUSABLE.  AT NO
TIME DOES ONE CHOOSE TO HELP ANOTHER PERSON BY CONDUCTING
THEMSELVES IN INAPPROPRIATE SEXUAL CONDUCT WITH A MINOR.  I
MEAN, I DON'T SEE HOW IN ANYBODY'S EYES THAT COULD EVER BE
VIEWED AS HELPING AN INDIVIDUAL.

WE'RE GOING TO CONTINUE TO GO THROUGH THIS FOR A LONG
TIME.  I HAVE A 6-YEAR OLD SON, AS WELL AS I HAVE A YOUNG
NIECE, TAY.  YOU KNOW, AS PARENTS BRINGING THEM UP WE HAVE A
COMPLETE -- I THINK I CAN SPEAK FOR MY WIFE ON THIS TOO,
COMPLETE DIFFERENT PERSPECTIVE ON HOW WE'LL CONDUCT THINGS.
VIDEO GAMES ARE NO LONGER LOCATED IN BEDROOMS.  THEY ARE
LOCATED IN THE LIVING ROOM.  THEY WILL BE MONITORED AT ALL

TIMES. I'M NOT GOING TO DISCONNECT OR ALTER THE WORLD FOR MY
CHILDREN WHERE THEY CAN'T LIVE LIKE OTHER PEOPLE BECAUSE OF
THIS INCIDENT, BUT IT'S DEFINITELY MONITORED TO A MUCH GREATER
EXTENT THAN IT WAS BEFORE, EVEN THOUGH WE THOUGHT WE WERE DOING
A GOOD JOB.

THESE PEOPLE THEY PREY. THEY'RE VERY ELUSIVE. I COME
TO FIND OUT I WAS SITTING ADJACENT TO ONE AT WORK THAT WAS JUST
RECENTLY THROUGH THESE DOORS. THEY'RE EVERYWHERE. IT'S SCARY
AS A PARENT TO KNOW THAT.

AND I DO FEEL FOR TONY'S FAMILY. I APOLOGIZE THAT
THEY'RE HAVING TO GO THROUGH THIS. I DON'T THINK ANY PARENT
SHOULD EVER HAVE TO DEAL WITH THIS, JUST AS WE SHOULDN'T. I
TRUST IN THE COURT THAT THEY'LL MAKE THE CORRECT DECISION AND
THAT THEY'LL GIVE THE APPROPRIATE SENTENCE FOR THIS.

BUT ONE THING I WOULD LIKE TO POINT OUT IS IF THINGS
WERE JUST A LITTLE BIT DIFFERENT, HOW MAY THIS HAVE ENDED? IT
MAY NOT HAVE BEEN A TRIAL OF THIS SORT. IT COULD HAVE BEEN A
MURDER TRIAL. WE DON'T KNOW THAT. THESE ARE THINGS THAT NEVER
WERE ABLE TO COME TO FRUITION. IF IN THE FUTURE IF HE'S
RELEASED, I'LL ALWAYS CARRY IT AROUND IN THE BACK OF MY MIND
OF, YOU KNOW, IS THERE GOING TO BE ANOTHER ONE? IS IT GOING TO
END IN A DIFFERENT FASHION? THE FACT THAT THERE WAS A GUN IN
THE CAR. IT'S A LITTLE SCARY. I MEAN, HE COULD HAVE USED THAT
AS A DIFFERENT EXIT STRATEGY.

I JUST DON'T AGREE IN WHAT HE SAYS IS A RESCUE MISSION.

1    I DON'T THINK BY ANY MEANS IT'S A RESCUE MISSION.  THIS WAS FOR

2    SELF BENEFIT.  HE DID THINGS THAT REALLY AREN'T SOMETHING THAT

3    YOU DO WHEN YOU'RE TRYING TO HELP SOMEBODY.

4         WE'RE JUST GOING TO CONTINUE GOING ON WITH OUR LIVES,

5    TRY TO PUT THIS AS FAR BEHIND US AS WE POSSIBLY CAN.  WE KNOW

6    MORE THAN LIKELY WE'LL BE BACK HERE DEALING WITH THIS PROBABLY

7    FOR THE REST OF OUR LIVES OR THE MAJORITY OF IT WITH THE

8    APPEALS PROCESS AND WHAT HAVE YOU.  THAT'S PART OF OUR REALITY

9    NOW THAT WE HAVE TONY TO THANK FOR.  THAT'S BASICALLY HOW THE

10   REST OF OUR LIVES WILL BE.  IT'S TRYING, BUT WE'LL DO IT.

11   WE'RE A STRONG FAMILY.  WE'LL PULL IT TOGETHER EVENTUALLY.

12   IT'S JUST HASN'T BEEN EASY, AND WE'LL FIGURE IT OUT FROM HERE.

13        SO I TRUST YOU'LL MAKE THE RIGHT DECISION.  TAKE CARE,

14   YOUR HONOR.

15        THE COURT:  THANK YOU, MR. CAREY, I APPRECIATE YOUR

16   COMMENTS.

17        WHO ELSE WOULD LIKE TO ADDRESS THE COURT?

18        MS. KAISER:  LUIS RAMIREZ.

19        MR. RAMIREZ:  GOOD MORNING, YOUR HONOR.

20        THE COURT:  GOOD MORNING, MR. RAMIREZ.

21        MR. RAMIREZ:  MY NAME IS LUIS RAMIREZ.  I AM JOHNATHAN

22   AGUIRRE'S STEPFATHER.  I PREPARED A STATEMENT, AS WE WERE

23   ASKED.  I WOULD JUST LIKE TO DIG INTO IT.

24        THE COURT:  STEP A LITTLE BIT CLOSER TO THE

25   MICHROPHONE, SIR.

```
 1          MR. RAMIREZ:  SURE.  YOUR HONOR, I CANNOT STOP THINKING

 2   OF THE DAY THIS NIGHTMARE BEGAN.  I HAD JUST STARTED A NEW JOB

 3   THE WEEK PRIOR AND RECEIVED A CALL FROM LANAI INDICATING

 4   JOHNATHAN HAD NOT SHOWN UP AT THE PICKUP POINT FOR MY FATHER.

 5   THE IMPACT OF SEEING POLICE AT MY HOUSE AND WIFE IN TOTAL PANIC

 6   WAS A SHOCK.  AFTER HOURS OF SEARCHING ON OUR OWN AROUND TOWN,

 7   NETWORKING WITH HIS FRIENDS AND ACQUAINTANCES TO NO AVAIL, THE

 8   SITUATION HAD GREATLY INTENSIFIED.  ALTHOUGH I HAVE CYCLED

 9   THROUGH MY FEELINGS THROUGHOUT THAT DAY, WHAT STICKS OUT FOR ME

10   WAS THE PROMISE, "WE KNOW WHERE HE IS, AND HE WILL BRING HIM

11   BACK TO YOU ALIVE."

12          AS A FAMILY, WE HAVE CHANGED.  WE WERE FRAGMENTED FOR

13   SOME TIME, BUT WE'LL GROW AGAIN.  THE DEPTH OF THIS INCIDENT

14   HAS CAUSED US TO BE FEARFUL EVEN AFTER DEALINGS WITH POLICE,

15   DETECTIVES, PROSECUTION TEAMS HAVE ENDED.  I FEEL MORE AWARE OF

16   MY SURROUNDINGS AND WHAT LIES BEHIND EVERYDAY HAPPENINGS

17   OVERLOOKED BEFORE.  THE FRUSTRATIONS WE HAVE FELT OVER THE

18   PROCEEDINGS AND THE DEFENDANT'S AUDACIOUS CLAIMS THAT THIS WAS

19   A RESCUE MOTION GONE AWRY HAVE BEEN TOO MUCH AT TIMES.

20          I'M OLD ENOUGH TO WRAP MY HEAD AROUND WHAT HAS

21   TRANSPIRED.  I'VE MANAGED TO HAVE KEPT BUSY WITH MY JOB AND

22   ENSURING WE HAVE THE NECESSITIES TO KEEP GOING.  MUCH OF THIS

23   TIME TRAPPED FEELINGS WERE ONLY -- THAT WERE ONLY EXISTING,

24   AWAITING WORD FOR THE NEXT STEP IN THE JUDICIAL PROCESS.  WHAT

25   I LACK IS PROVIDING THE COMPLETE SUPPORT AND ASSURANCE TO MY
```

FAMILY THAT THIS IS WELL BEHIND US, MOREOVER, THAT THIS WILL
NEVER HAPPEN AGAIN.

WE'RE ONLY JUST BEGINNING TO SEE OUR SON MATURE INTO
BEING SOMETHING OTHER THAN A VICTIM.  HE HAS COME A LONG WAY
SINCE THOSE INITIAL DAYS BACK.  I HAVE EXPERIENCED HIM BECOME
MORE ASSERTIVE, OUTGOING AND FOCUSED.  I AM VERY PROUD OF HIM.
WE ARE ALL PROUD OF HIM.

WE HAVE HAD THIS PAIN INFLICTED UPON US WITHOUT CAUSE.
I STRONGLY BELIEVE IT IS TIME TO INDEMNIFY MY FAMILY BY
IMPLORING YOUR HONOR TO HAND DOWN THE MAXIMUM SENTENCE ALLOWED.
GIVEN THE BRAZENNESS AND MANIPULATIVE NATURE EXPOSED IN COURT
PROCEEDINGS, WHICH WERE PROVEN, ANYTHING LESS FOR THIS
PERPETRATOR WOULD BE DISTRESSING TO THE VICTIMS AND DETRIMENTAL
TO THE PUBLIC IN YEARS TO COME.  THANK YOU.

THE COURT:  THANK YOU VERY MUCH, MR. RAMIREZ.

MS. KAISER:  CAMERON RAMIREZ, YOUR HONOR.

MRS. RAMIREZ:  I WANTED TO START OFF WITH MENTIONING
THE GUN ALSO IN THE VEHICLE.

THE COURT:  WOULD YOU STATE YOUR FULL NAME FOR US.

MRS. RAMIREZ:  CAMERON RAMIREZ.

THE COURT:  THANK YOU, MA'AM.

MRS. RAMIREZ:  IT WAS STATED THAT THE GUN WAS NEVER
BROUGHT INTO TRIAL, THAT MY SON NEVER SAW THE GUN, BUT ALSO MY
SON NEVER MADE IT TO THE CAR DUE TO THEY DID ARREST HIM ON THE
TARMAC, SO IT DOES MAKE ME WONDER WHAT WOULD HAVE HAPPENED TO

HIM HAD HE ACTUALLY GOTTEN IN THAT CAR.  MCLEOD WAS ALREADY
AWARE THAT THE POLICE WERE ONTO HIM, AND EVEN THEN HE DECIDED
TO FLY ACROSS THE COUNTRY AND COME AND PICK UP MY SON, KNOWING
THE POLICE WOULD BE KNOCKING ON HIS DOOR AT ANY TIME, AND I
DON'T SEE WHY HE WOULD WANT THE VICTIM IN HIS HOUSE WITH HIM
WHEN THE POLICE DID COME KNOCKING ON HIS DOOR.  SO MY STRONG
BELIEF IS THAT HE MOST LIKELY WAS GOING TO KILL HIM.

THE NIGHT MY SON WENT MISSING I COULD ACTUALLY PICTURE
HIM BEING BURIED.  I DID NOT THINK I WAS GOING TO GET HIM BACK
ALIVE.  RIGHT AWAY I KNEW THAT THE DEFENDANT HAD HIM.  I HAD
BEEN RESEARCHING HIM FOR 11 DAYS PRIOR, USING EVERY SEARCH
ENGINE POSSIBLE TO FIGURE OUT WHO THIS DEFENDANT WAS, AND
CONTINUED TO NOTIFY POLICE.  WHEN POLICE CAME TO MY HOUSE, I
COULDN'T GET OFF MY DRIVEWAY.  I WAS -- JUST COLLAPSED.  MY
DAUGHTER, 17-YEAR OLD -- 18-YEAR OLD NOW, HAD TO DEAL WITH
WATCHING HER BROTHER, FINDING OUT ABOUT THE RELATIONSHIP,
HAVING TO CHANGE SCHOOLS BECAUSE OTHER CHILDREN WERE AWARE OF
WHAT HAD HAPPENED AT HIS PREVIOUS SCHOOL, AND SHE HAD TO TAKE
ON THE PROTECTOR ROLE FOR HIM.

WHAT THE DEFENDANT HAS DONE IS UNFORGIVEABLE AND WAS
DONE FOR HIS OWN SICK PLEASURE.  THE DEFENDANT WAS VERY BOLD,
AND HE WENT TO GREAT LENGTHS TO KIDNAP MY SON.  MY SON IS
CHANGED FOR LIFE DUE TO THE ACTIONS OF MCLEOD, AND HE NO LONGER
HAS HIS INNOCENCE.  HE ALSO IS CONSTANTLY IN FEAR, AND HAS BEEN
ROBBED OF HIS CHILDHOOD.

```
 1          I HONESTLY FEEL THE DEFENDANT, KNOWING THE POLICE WERE

 2     ALREADY IN CONTACT, WOULD BE LOOKING FOR HIM.  THE DEFENDANT

 3     HAD A LOADED GUN IN HIS CENTER CONSOLE WITH TWO MAGAZINES.

 4     THAT MAKES ME STRONGLY BELIEVE THAT JOHNATHAN WAS GOING TO BE

 5     KILLED SO HE COULD GET RID OF THE EVIDENCE.  IF MCLEOD IS

 6     RELEASED, THIS HAS JUST BEEN A LEARNING EXPERIENCE FOR HIM, AND

 7     I FEAR THAT NEXT TIME HE WILL BE SUCCESSFUL IN GETTING RID OF

 8     HIS VICTIMS.  HE IS A VERY DANGEROUS MAN, AND HE HAS NO REMORSE

 9     FOR WHAT HE HAS DONE.

10          YOUR HONOR, I AM REQUESTING YOU GIVE THE DEFENDANT THE

11     MAXIMUM SENTENCE ALLOWED BY THE COURT.  OVER THE PAST TWO

12     AND-A-HALF YEARS OUR FAMILY HAS BEEN THROUGH SO MUCH BY THE

13     ACTIONS OF THE DEFENDANT.  THE DEFENDANT HAS SHOWN SIGNS OF NO

14     REMORSE.  DUE TO HIS SICK PLEASURE, HE PUT OUR FAMILY THROUGH

15     SO MUCH TURMOIL.  I WOULD LIKE TO ASK THE COURT IF ANYONE WOULD

16     FEEL COMFORTABLE LEAVING THEIR CHILDREN OR GRANDCHILDREN WITH

17     THE DEFENDANT AFTER HE IS RELEASED.

18          DUE TO THE ACTIONS OF THE DEFENDANT, I HAVE LOST MY

19     JOB, WHICH HAS BEEN A HORRIBLE HARDSHIP ON OUR FAMILY.  MY

20     DAUGHTER ALSO WOULD HAVE LIKED TO SPEAK, HOWEVER, DUE TO THE

21     CHANGES IN THE COURT'S SCHEDULE, SHE WAS UNABLE TO MAKE IT

22     TODAY.

23          WE AS A FAMILY HAVE LOST OUR SENSE OF SECURITY, AND

24     WE'RE ALWAYS LOOKING OVER OUR SHOULDER.  I WOULD ALSO LIKE TO

25     MENTION THAT MY NOW 8-YEAR OLD DAUGHTER HAS BEEN -- WHAT SHE
```

1    HAS BEEN THROUGH.  SHE BEGGED ME FOR THIS TO FINALLY BE OVER SO

2    SHE CAN FINALLY HAVE HER MOTHER BACK.  THIS HAS BEEN EXTREMELY

3    HARD FOR HER.  SHE CAME HOME ON JUNE 10TH, 2013 TO POLICE CARS

4    ALL AROUND THE HOME, KNOWING HER BROTHER WAS GONE.

5         I BEG YOU TO GIVE HIM THE MAXIMUM SENTENCE ALLOWED.  IF

6    HE WOULD HAVE COMMITTED THESE CRIMES SEPARATELY, THEN HE WOULD

7    HAVE BEEN CONVICTED SEPARATELY AND HANDED DOWN SEPARATE

8    SENTENCES.  THANK YOU, YOUR HONOR.

9         THE COURT:  THANK YOU, MRS. RAMIREZ.

10        IS THERE ANYBODY ELSE WHO WOULD LIKE TO ADDRESS THE

11   COURT?

12        MS. KAISER:  TWO MORE, YOUR HONOR.

13        THE COURT:  CERTAINLY.

14        MR. M. CAREY:  GOOD MORNING, YOUR HONOR.

15        THE COURT:  STATE YOUR FULL AND COMPLETE NAME.

16        MR. M. CAREY:  MAXWELL JOHNATHAN CAREY.

17        THE COURT:  THANK YOU.

18        MR. M. CAREY:  WHAT WE'VE BEEN THROUGH THESE PAST TWO

19   YEARS HAS ALMOST COMPLETELY DESTROYED MY FAMILY, AND THAT MOST

20   OF THE TIME WE HAVE TROUBLE TOGETHER BECAUSE OF THIS.  AND IT'S

21   HARD ON HIS FAMILY BECAUSE OF WHAT HE'S DONE, AND IT'S HIS

22   MISTAKE, BUT I THINK WHAT HE'S DONE TO US IS A LOT GREATER THAN

23   WHAT HE'S DONE TO HIS FAMILY ON HIS SIDE BECAUSE WE CAN BARELY

24   OPERATE ON OUR SIDE.  THAT'S BASICALLY WHAT I HAD TO SAY.

25        THE COURT:  THANK YOU.

1    MR. M. CAREY:  THANK YOU.

2    THE COURT:  I APPRECIATE YOUR COMMENTS.

3    MR. J. AGUIRRE:  GOOD MORNING, YOUR HONOR.

4    THE COURT:  STATE YOUR FULL AND COMPLETE NAME.

5    MR. J. AGUIRRE:  JOHNATHAN DANA J. AGUIRRE.

6    THE COURT:  GO AHEAD.

7    MR. J. AGUIRRE:  FIRST, I WOULD LIKE TO TALK ABOUT HOW

8    IT HAS AFFECTED MY LIFE VERY MUCH, SUCH AS THAT I HAVE INTENSE

9    FEAR AS I GO.  I HAVE VERY BAD TRUST ISSUES BETWEEN ANYONE.  AS

10   I CAN SPEAK RIGHT NOW, MY HEART'S RACING BECAUSE I HAVE THAT

11   INTENSE FEAR, AND JUST THE THOUGHT OF GOING THROUGH THIS HAS

12   AFFECTED MY LIFE VERY GREATLY AND HAS AFFECTED MY FAMILY IN AN

13   EXTREMELY BIG AMOUNT I WOULD SAY.

14   OUR FAMILY HAS PRACTICALLY BROKEN UP BECAUSE ALL THIS

15   FRICTION WITH THE COURT HAS AFFECTED OUR FAMILY VERY GREATLY.

16   I WOULD SAY THAT HALF OUR FAMILY DON'T REALLY TALK TO EACH

17   OTHER ANYMORE BECAUSE -- THE AMOUNT OF GUILT, I CAN'T TALK --

18   WHEN I SEE MY FAMILY I HAVE THE GREATEST AMOUNT OF GUILT I'VE

19   EVER FELT BEFORE.

20   I HAVE PROBLEMS FOCUSING IN SCHOOL.  I HAVE PROBLEMS

21   MAKING FRIENDS.  I'VE MOVED THROUGH THREE SCHOOLS IN THE LAST

22   THREE YEARS.  I'VE BEEN THROUGH EVERY SCHOOL IN ESCONDIDO.

23   IT'S VERY HARD TO HAVE IT NOT AFFECT ME GREATLY.

24   IT'S HARD FOR ME TO KEEP A SMILE ON MY FACE.  I'M

25   USUALLY A VERY HAPPY, VERY CARING PERSON, BUT LATELY I'VE BEEN

1    VERY DOWN AND VERY QUIET AND TO MYSELF.  I HAVE PRACTICALLY

2    LOST A RELATIONSHIP WITH MY ENTIRE FAMILY BECAUSE I HAVE THE

3    VERY GREAT AMOUNT OF GUILT.

4         I CAN'T LOOK AT HIS FAMILY WITHOUT SEEING HIM, WITH HIS

5    ACTIONS THAT AFFECTED MY FAMILY VERY, VERY GREATLY.  JUST

6    SITTING AND THINKING THAT THEY'RE SITTING THERE DEFENDING HIM

7    STILL WHEN THEY ACTUALLY KNOW WHAT HE'S DONE, AND THE FACT THAT

8    HE ACTUALLY DID THIS TO TWO PEOPLE, ME AND MY COUSIN.  ME AND

9    MY COUSIN WE'RE STILL UNDERAGE, AND IT SHOWS THAT HE'S GREATLY

10   AFFECTED BOTH OF US.  IT'S GREATLY AFFECTED OUR RELATIONSHIP

11   WITH OUR PARENTS AND THE REST OF OUR FAMILY.

12        THIS HAS AFFECTED MY SCHOOL SUCH AS THAT NOW VERY

13   RARELY I HAVE BREAKDOWNS.  I WALK OUT OF CLASS BECAUSE I CAN'T

14   DEAL WITH THE AMOUNT OF PRESSURE ANYMORE.  AS I'M SPEAKING, I'M

15   SHAKING A LOT.  I CAN FEEL -- IT'S HARD.

16        THE COURT:  I UNDERSTAND.

17        MR. J. AGUIRRE:  THIS INCIDENT WITH THE DEFENDANT

18   HAVING NOW HAPPENED I REALIZE THAT YOU HAVE TO SPEND LOTS OF

19   TIME WITH THIS PERSON IN ORDER TO TRUST SOMEONE.  I WOULD NOT

20   FEEL SAFE IF HE WAS BACK OUT ON THE STREETS.  I WOULD NOT FEEL

21   SAFE IF HE DID NOT HAVE FULL SUPERVISED RELEASE FOR THE REST OF

22   HIS LIFE.  I WOULD LIKE THE MAXIMUM AMOUNT OF PENALTY HE COULD

23   GET.  I'M SORRY.

24        THE COURT:  TAKE YOUR TIME, JOHNATHAN.  IT'S ALL RIGHT.

25        MR. J. AGUIRRE:  THE AMOUNT IT'S AFFECTED MY PARENTS.

```
1    I DON'T REALLY SEE MY FATHER ANYMORE BECAUSE THROUGH ALL THIS I
2    DON'T KNOW IF MY DAD HAS THE -- MY DAD DOESN'T KNOW WHAT TO DO.
3    HE JUST DOES NOT KNOW WHAT TO DO.  HE DOES NOT KNOW HOW TO
4    APPROACH ME ABOUT THIS.  HE DOES NOT KNOW WHAT IS GOING ON
5    BECAUSE HE HAS THE FEAR OF IT.
6         MY STEPFATHER, HE'S BEEN THERE SINCE I WAS LITTLE, AND
7    HE'S LOVED ME SINCE HE FIRST MET ME.  HE TREATS ME AS A SON,
8    AND SO DOES MY UNCLE, NEIL CAREY, HE TREATS ME AS ONE OF HIS
9    SONS, TOO.  AND I FEEL SAFE AROUND MY FAMILY, BUT WHEN I SEE MY
10   MOM HER BREAK DOWN CONSTANTLY, IT HURTS.  THIS HAS CREATED A
11   VERY BIG PROBLEM IN OUR LIVES.  OUR WHOLE ENTIRE FAMILY'S LIVES
12   WE HAVE DEALT WITH SO MANY, SAY, FIGHTS, FRICTION.
13        AND THE FACT THAT HE IS ASKING FOR THE LITTLEST -- SOME
14   PENALTY THAT IS NOT -- HE'S ASKING FOR LESS OF A PENALTY THAN
15   HE IS DESERVED.  HE'S DONE THIS BEFORE I WOULD SAY.  HE DID
16   THIS TO MY COUSIN.  MY COUSIN, THE ONE I LOVE GREATLY.  I
17   BARELY GET TO SEE HIM ANYMORE BECAUSE IT'S CAUSED VERY, VERY
18   GREAT FRICTION BETWEEN MY FAMILY AND I.
19        I DON'T REALLY -- NOW, I HIDE IN MY ROOM BECAUSE I DO
20   NOT HAVE -- I FEEL A GREAT AMOUNT OF GUILT WHEN I'M AROUND THE
21   HOUSE.  I FEEL LIKE I DON'T BELONG AT THE HOUSE ANYMORE BECAUSE
22   I'VE CAUSED THAT AMOUNT OF GUILT, BUT I KNOW THEY LOVE ME
23   UNCONDITIONALLY, SO THEY WILL KEEP ME IN THAT HOUSE.  I HAVE
24   GONE THROUGH SO MUCH AND I'VE GROWN UP.  I PRACTICALLY LOST MY
25   CHILDHOOD AND LOST MY INNOCENCE.
```

THE AMOUNT OF STRAIN IT'S PUT US IN OUR FAMILY, THE
AMOUNT OF FEAR MY SISTER HAS, MY LITTLE AND MY BIGGER SISTER.
MY BIG SISTER HAS A GREAT AMOUNT OF GUILT, TOO.  I DON'T KNOW
WHY, BUT SHE FEELS THAT SHE COULD HAVE DONE MORE.  AND SHE IS
VERY, VERY DISTRAUGHT THAT SHE COULD NOT APPEAR IN COURT TODAY
BECAUSE HER SCHEDULE WITH HER WORK AND EVERYTHING LIKE THAT
BECAUSE THE COURT HAS A VERY -- IT'S VERY FLEXIBLE, AND IT'S
VERY HARD ON OUR SCHEDULES.

        LIKE RIGHT NOW, I AM MISSING SCHOOL.  I'VE MISSED SO
MUCH SCHOOL, AND I'VE BEEN PULLED OUT OF SCHOOL BECAUSE OF THE
AMOUNT OF DISTRAUGHT I'VE FELT.  I'VE BROKEN DOWN MANY, MANY
TIMES AT SCHOOL, AND I COULD NOT SEE -- I CANNOT SHOW ANYONE
HOW WEAK I FEEL.  I TRY TO STAY STRONG.  I AM NOW CURRENTLY IN
A JUNIOR ROTC PROGRAM.

        I'VE GROWN UP AS A PERSON.  I'VE GROWN VERY MUCH
SKILLS.  I'VE MATURED SO MUCH AS I WAS BEFORE.  I PLAY NO VIDEO
GAMES.  THERE'S NO CONSOLES IN OUR HOUSE AT ALL BECAUSE EVEN IF
WE GOT A CONSOLE, I WOULDN'T WANT IT.  I WOULDN'T WANT IT IN
OUR HOUSEHOLD BECAUSE I WOULD THAT INTENSE FEAR OF THAT
POSSIBLY HAPPENING TO ANYBODY ELSE.

        I AM VERY PROTECTIVE OF MY SISTER BECAUSE I HAVE A FEAR
SOMETHING'S GOING TO HAPPEN WITH HER, AND I HAVE THE GREAT FEAR
THAT IT'S GOING TO AFFECT ME LATER ON IN LIFE BECAUSE IT'S
AFFECTED ME SO MUCH IN THE LAST 30 MONTHS.

        I CAUSED MY ENTIRE FAMILY GREAT STRESS, AND I GREATLY

APOLOGIZE TO MY FAMILY. I APOLOGIZE FOR TAKING YOUR GUYS' TIME

TO DEAL WITH THIS BECAUSE THIS SHOULDN'T HAVE HAPPENED. THIS

WAS A BIG MISTAKE ON MY END. I SHOULDN'T HAVE LEFT -- LET IN A

HORRIBLE PERSON INTO MY LIFE. I WILL NO LONGER LET ANY ADULTS

REALLY TALK TO ME. I DON'T REALLY LIKE ANYONE TALKING TO ME AT

ALL. I USED TO BE A VERY SOCIAL PERSON. I'M NOT AS SOCIAL AS

I WAS BEFORE.

I GIVE GREAT GRATITUDE TO DAVID AND CHARLOTTE KAISER

BECAUSE THEY HAVE BEEN HERE FOR -- THEY HAVE BEEN HERE THIS

WHOLE TIME, AND THEY HAVE COMFORT ME AND EVERYTHING. THEIR

APPROACH WAS VERY, VERY GOOD TOWARDS ME TO OPEN UP. I'VE

EARNED THEIR TRUST, AND I KNOW THEY WON'T TURN THEIR BACKS ON

ME. I KNOW LATER IN LIFE IF I EVER NEEDED TO TALK TO THEM, I

COULD TALK TO THEM BECAUSE I KNOW THEY WOULD LET ME IN.

AS I SEE MY FAMILY TODAY, WE'RE ALL HERE EXCEPT SOME OF

US BECAUSE WORK AND EVERYTHING LIKE THAT. I'M VERY GRATEFUL

THAT MY FAMILY IS HERE, AND THEY ALWAYS WILL BE.

TO SEE TONY'S FAMILY, HOW THEY STILL HAVE HIS BACK,

IT'S VERY DISAPPOINTING BECAUSE WHY WOULD THEY STILL BACK UP

SOMEONE THAT DID THIS TO A CHILD, HAD SEXUAL INTENTIONS WITH

TWO MINORS OF THE SAME FAMILY? THE FACT THAT THEY SAID THAT AT

LEAST 28 PERCENT OF TEENAGERS SEND SEXUAL TEXTS, THEY DO

BECAUSE THIS IS WHERE KIDS GROW UP AND THEY FEEL THEY'RE OLD

ENOUGH TO FULFILL THEIR NEEDS.

I HAVE NO INTEREST IN ANYONE. I WILL NOT HAVE ANY

INTEREST IN ANYONE FOR A LONG TIME BECAUSE I HAVE VERY BIG
TRUST ISSUES WITH ANYONE.  I RARELY LET ANYONE IN.  I HAVE
BUILT UP FEELINGS FOR A VERY, VERY LONG TIME.  AND THE FEAR OF
THIS MIGHT HAPPEN TO ME AGAIN WHEN I'M OUT, I HAVE -- I WILL
CONSTANTLY LOOK OVER MY SHOULDER.  IF I LISTEN TO MUSIC, I DO
NOT LISTEN WITH HEADPHONES IN BECAUSE I HAVE THE FEAR THAT
SOMEONE MIGHT BE BEHIND ME.

I USUALLY DON'T WALK HOME.  I USUALLY GET RIDES HOME
BECAUSE I DON'T LIKE BEING ALONE.  I CAN'T STAND BEING ALONE.
IT HURTS.  I'M GLAD THAT I HAVE MY FRIENDS NOW BECAUSE I KNOW
THEY CARE ABOUT ME, AND I KNOW THEY ALWAYS WILL BECAUSE THEY'VE
SEEN HOW BAD THIS COURT HAS AFFECTED ME.

I HAVE THE FEAR OF REALLY TELLING WHAT HAPPENED BECAUSE
THE FEAR OF SOMEONE THINKING OF ME BADLY IS VERY SUBSTANTIAL IN
MY LIFE, THE FEAR OF SOMEONE THINKING BAD OF ME SUCH AS I HAD
-- IN ROTC I HAD TO TALK TO MY COMMANDER ABOUT WHAT'S BEEN
GOING ON BECAUSE LATELY I'VE BEEN MISSING DRILL PRACTICE.  I
WAS ON DRILL TEAM, BUT I'M NOT ANYMORE BECAUSE I'M MISSING SO
MUCH BECAUSE OF THE AMOUNT OF STRESS THAT'S BUILT ON ME.  I
TALKED TO HIM ABOUT IT, AND HE'S BEEN VERY, VERY GOOD ABOUT IT.
HE'S BEEN VERY UNDERSTANDING.

THIS IS AFFECTING MY LIFE VERY, VERY GREATLY, AND I
WOULD LIKE HIM TO HAVE THE MOST MAXIMUM SENTENCE HE COULD AND
THE SUPERVISION TO BE ON THE TOP.

I WOULD FEEL SAFE IF HE DID NOT HAVE ANY TECHNOLOGY

THAT HAS BEEN CONNECTED TO THE INTERNET, AND NO CONTACT REALLY TO THE OUTSIDE WORLD NEAR ANY CHILDREN BECAUSE I HAVE THE FEAR HE'S GOING TO DO IT AGAIN BECAUSE -- IF STUDIES SHOW THAT HE IS NOT INTERESTED IN CHILDREN, THEN WHY DID HE GO AFTER ME AND MY COUSIN?  WE WERE UNDERAGE.  WE'RE STILL UNDERAGE, AND THIS STILL AFFECTS OUR LIFE VERY, VERY GREATLY.

AND THE FACT THAT HE DID HAVE A BAD CHILDHOOD WOULDN'T HE WANT TO TURN IT AROUND AND NOT DO IT TO ANYONE ELSE?  SINCE THIS HAPPENED TO ME, I WILL NOT LET THIS AFFECT ME LATER IN LIFE BECAUSE I DON'T WANT ANYONE TO HAVE THAT HAPPEN TO THEM EVER AGAIN.

I HAVE VERY, VERY -- I'M VERY, VERY CARING FOR THE PEOPLE THAT ARE ABUSED, AND I WOULD SAY I WASN'T ABUSED, BUT I WAS VERY -- I TOOK EVERYTHING DRASTIC WHEN I WAS LITTLE -- OR YOUNGER, AND NOW I SEE THE TRUTH.  I'VE LOST MY CHILDHOOD.  I WAS FORCED TO MATURE VERY, VERY QUICKLY, AND IT'S BEEN HARD ON ME.

I DO NOT ENJOY VIDEO GAMES.  I FEEL LIKE I WOULD NEVER ENJOY VIDEO GAMES EVER AGAIN JUST TO KNOW THAT THAT COULD HAVE POSSIBLY HAPPENED.  AND TO SEE THAT OTHER PEOPLE HAVE SYSTEMS, I PARTICULARLY DON'T -- RATHER HAVE THEM NOT IN THE HOUSEHOLD UNLESS THEY'RE VERY, VERY CLOSELY MONITORED, SUCH AS NO MICROPHONE, NO COMMUNICATION ON THE SYSTEMS, JUST PLAY ONLINE WITH NO COMMUNICATIONS WHATSOEVER WOULD MAKE ME FEEL A LOT BETTER.

```
 1          TODAY I WOULD SAY I FEEL -- I'VE GROWN FROM THIS.  I'VE
 2     LEARNED WHAT TO LOOK OUT FOR, AND LATER IN LIFE I WANT TO HELP
 3     PEOPLE THAT THIS HAPPENED TO BEFORE.  ONE OF MY GREAT PASSIONS
 4     IS TO FIND THE BEAUTY IN LIFE, SUCH AS PHOTOGRAPHY.  THAT'S ONE
 5     OF THE CAREERS I WANT TO GET INTO, AND I WANT TO SHOW THE WORLD
 6     IN ITS BEAUTY.  AND I KNOW THE WORLD IS VERY MESSED UP PLACE,
 7     AND IT MIGHT AFFECT EVERYONE GREATLY, BUT IT'S -- BUT IT HELPS
 8     TO MOVE ON.
 9          I HAVE TRIED TO NOT THINK OF THIS AS MUCH AS I COULD.
10     THIS HAS AFFECTED MY RELATIONSHIP WITH EVERYONE.  THIS HAS --
11     WHEN I GO TO MY STEPFATHER'S PARENTS' HOUSE, I CAN'T REALLY
12     LOOK AT THEM THE SAME BECAUSE THE FACT -- THE AMOUNT OF PAIN
13     I'VE MADE THEM GO THROUGH, THE AMOUNT OF GUILT I HAVE FOR THEM.
14     WHENEVER I GO OVER TO THEIR HOUSE, I REALLY DON'T TALK BECAUSE
15     I FEEL A GREAT AMOUNT OF GUILT, AND I KNOW THEY FEEL A GREAT
16     AMOUNT OF GUILT AND A LOT OF PAIN BECAUSE OF THE FEAR THT THEY
17     HAVE IN -- THE FEAR THEY ALWAYS WILL HAVE, AND I AM GREATLY
18     SORRY FOR HIS PARENTS AND WHAT I DID TO THEM.
19          AND I'M GREATLY SORRY FOR WHAT TONY DID TO MY ENTIRE
20     FAMILY.  HE HAS AFFECTED MY ENTIRE FAMILY GREATLY.  TO SEE MY
21     MOM IN THE AMOUNT OF STRESS SHE'S BEEN FOR A LONG TIME, I WOULD
22     LIKE TO ASK FOR THE MAXIMUM AMOUNT OF SENTENCE AND THE MAXIMUM
23     AMOUNT OF SUPERVISION.  THAT WILL BE ALL.  THANK YOU, YOUR
24     HONOR.
25          THE COURT:  THANK YOU VERY MUCH, JOHNATHAN.
```

```
 1          MS. KAISER, IS THAT EVERYBODY WHO WOULD LIKE TO ADDRESS
 2    THE COURT?
 3          MS. KAISER:  THAT'S IT, YOUR HONOR.
 4          THE COURT:  PLEASE GO AHEAD, MS. KAISER.
 5          MS. KAISER:  IF THERE'S ANY QUESTION ABOUT HARM AND
 6    THIS INVOLVING TEENAGERS, I THINK WHAT THE COURT HAS JUST HEARD
 7    FROM JOHNATHAN AND MAX AND THEIR FAMILIES IS DEMONSTRATIVE.
 8    YOU CAN'T MEASURE THE HARM.  YOU CAN'T QUANTIFY IT.  NO MATTER
 9    WHAT SENTENCE YOUR HONOR BRINGS DOWN, IT'S NOT GOING TO TAKE
10    AWAY FROM THIS, AND I DON'T THINK IT'S EVERY DAY THAT YOUR
11    HONOR HEARS FROM THESE KIDS, AND THEY'RE STILL KIDS, YOUR
12    HONOR, THEY'RE JUNIORS IN HIGH SCHOOL, AND ESPECIALLY HEARING
13    FROM JOHNATHAN, WHERE HE'S APOLOGIZING, AND HE TALKS ABOUT THE
14    GUILT THAT HE FEELS.
15          WE'VE MET WITH THESE KIDS SEVERAL TIMES, AND NO DOUBT
16    AT SOME POINT THERE WAS A BAD JUDGMENT CALL, BUT IT IS
17    SOMETHING THAT GREW FAR WORSE INTO NOT JUST EVERY PARENTS'
18    NIGHTMARE, BUT THE COMMUNITY'S, SOCIETY'S NIGHTMARE BECAUSE FOR
19    ABOUT 16 HOURS JOHNATHAN AGUIRRE CEASED TO EXIST.  HE
20    DISAPPEARED.  HE WAS JUST IN THE CLOUD.  AND AS HIS MOTHER
21    TALKED ABOUT, AS NEIL TALKED ABOUT, MAX'S DAD, JOHNATHAN'S
22    UNCLE, AND AS LUIS, JOHNATHAN'S STEPFATHER TALKED ABOUT, THERE
23    WAS A WHOLE BUNCH OF "WHAT IFS," WHAT IF THEY WERE SUCCESSFUL?
24    WHAT IF THERE WASN'T A DETECTIVE, LIKE DETECTIVE JACKSON, WHO
25    WORKED TIRELESSLY WITHOUT ANY TYPE OF SLEEP TRYING TO TRACK
```

1    EVERY STEP, AND TRACK DOWN, AND HONE IN TO TRY TO LOCATE

2    JOHNATHAN, AND FIGURE OUT ABOUT THE DELTA FLIGHT AND MATCHING

3    THE DATES.

4        THE BOTTOM LINE IS THAT TONY WAS AND IS AN ADULT, AND

5    DURING THOSE CONTACTS WITH THOSE KIDS HE WAS THE ADULT IN THE

6    ROOM.  AND DESPITE A DIFFICULT CHILDHOOD, HE HAD SO MANY

7    OPPORTUNITIES TO SUCCEED, AND SO MUCH LOVE, AND THAT'S WHAT

8    MAKES THIS ALL THE MORE SADDER BECAUSE HE NOT ONLY MANIPULATED

9    THESE CHILDREN AND AFFECTED THEIR FAMILIES, BUT LOOK AT WHAT

10    HE'S DONE TO HIS FAMILY AS WELL.

11        HE WASN'T A TEACHER, BUT HE WAS SOMEONE WHO HAD

12    RECENTLY GRADUATED FROM THE POLICE ACADEMY.  HE WAS STUDYING TO

13    BE IN LAW ENFORCEMENT, SOMEONE WHO HAD TAKEN THE STEPS TO BE

14    PART OF THE COMMUNITY, THE SOCIETY, SOMEONE TO PROTECT.  THAT

15    WAS THE CAREER PATH HE WAS GOING ON, AND YET AT THE SAME TIME

16    HE IS LIKE THOSE OTHER CASES WE HAVE SEEN WHERE THERE'S A

17    TEACHER TRADING IN CHILD PORNOGRAPHY, OR EVEN A PEDIATRIC NURSE

18    ABUSING CHILDREN.  THIS IS THE CAREER PATH TONY WAS CHOOSING.

19        AT A TIME WHEN THESE KIDS WERE TRYING TO LEARN AND

20    UNDERSTAND ABOUT THEMSELVES, THEIR OWN SEXUALITY, AND IT'S

21    DIFFERENT TIMES, THIS IS HOW KIDS COMMUNICATE.  HE EXPLOITED

22    THAT.  AND SO IN THAT EFFECT THERE'S NOTHING BENIGN ABOUT THIS

23    CASE.  IT'S NO LESS SIGNIFICANT THAN OTHER CASES, AND THE OTHER

24    CASES THAT DEFENDANT POINTS TO THE MAJORITY OF THEM WERE A

25    RESULT OF PLEA AGREEMENTS, AND EVEN IN THE WYLY CASE THE VICTIM

DIDN'T HAVE TO TESTIFY.  IN OUR CASE THE VICTIMS HAD TO TESTIFY
AND SIT THROUGH FOR AT LEAST HALF A DAY, EACH WITH A BARRAGE OF
QUESTIONS, AND VERY VIGOROUS QUESTIONS ABOUT THEIR VERACITY.

IN THAT REGARD, YOUR HONOR, JUST ONE LIMITED ISSUE I
WANT TO TOUCH BASE ON, DEFENSE COUNSEL POINTED OUT THE ISSUE
ABOUT THE SEXUAL CONDUCT INCIDENT, IT'S TRUE THAT THE JURY
DIDN'T MAKE ANY FINDINGS, BUT OBVIOUSLY WHEN YOUR HONOR MAKES
THE CALCULATIONS, WE WOULD JUST ASK YOUR HONOR TO INDICATE THE
FINDINGS BY A PREPONDERANCE OF THE EVIDENCE.

TONY MCLEOD HAS DEMONSTRATED HE'S A MASTER MANIPULATOR.
HE IS A DANGER TO SOCIETY.  WHILE A LIFETIME OF SUPERVISION
CERTAINLY WILL ASSIST TO FURTHER CONTROL HIS ACTIONS, THERE
NEEDS TO BE RESPECT FOR THE LAW AND PUNISHMENT.  THIS WAS NOT
AS SIMPLE AS AN ADULT TRADING IN IMAGES WITH A COUPLE OF
TEENAGERS.  THIS WAS AN ADULT WHO INGRAINED HIMSELF IN THE
LIVES OF TWO MIDDLE SCHOOLERS, EXPLOITED THOSE MIDDLE
SCHOOLERS' RELATIONSHIP AS COUSINS, LEARNED ALL HE COULD ABOUT
THEM.

HE FURTHER AT THAT POINT INTENSIFIED THE TENSION THAT
THESE CHILDREN HAD WITH THEIR FAMILY ALREADY.  THIS IDEA, AS
MS. MORGAN TALKED, ABOUT HOW TEENAGERS FEEL, HE EXPLOITED THAT
FURTHER AND DROVE INTO THAT WITH THE IDEA OF MAX'S MOVE WITH
HIS PARENTS, AND WITH JOHNATHAN'S OWN FEELINGS OF LONELINESS,
IN HIS OWN TERMS, COMING TO TERMS WITH HIS OWN SEXUALITY, AND
HIS RELATIONSHIP WITH HIS MOTHER, AND THEN HE TOOK IT FURTHER

BY COMING OUT, AND TAKING JOHNATHAN AWAY FROM HIS FAMILY.

YOUR HONOR, WE OUTLINED ALL THE PROPOSED SENTENCES, BUT IN THE END OUR OVERARCHING RECOMMENDATION IS A LITTLE OVER 33 YEARS. IT MAY SEEM LIKE A SIGNIFICANT AMOUNT OF TIME, AND CERTAINLY COMPARED TO THE DRUG CASES WE SEE, THE ILLEGAL ENTRY CASES, THE ALIEN SMUGGLING, IT'S NOT FOR WHAT HE DID, AND LOOKING AT THE WHOLE HISTORY OF THIS INDIVIDUAL, AND HOW HE PREYS, AND HOW HE MANIPULATES, SO TO THAT END WE WOULD SUBMIT ON THAT RECOMMENDATION, AND WE THANK YOU FOR IT.

THE COURT: THANK YOU, MS. KAISER.

FROM PROBATION.

THE PROBATION OFFICER: YES, YOUR HONOR, JILL POGUE FROM PROBATION.

I THINK THERE'S THREE ISSUES THAT NEEDED TO BE ADDRESSED, THE PSR, GOING TO THE BOP, THE ADDENDUM IS ALSO ATTACHED, AND THEREFORE WE OUTLINE ALL THE OBJECTIONS FROM DEFENSE AND HOW WE RESPONDED.

AS FAR AS THINGS THAT -- I MADE STATEMENTS THAT THEY WERE STATED, THERE WAS VOLUMES OF DISCOVERY. WHEN WE OUTLINE DISCOVERY, IT IS THOSE PERTINENT TO THE CHARGES AND CONVICTIONS WITHIN THE PROCESS, SO OBVIOUSLY WE DIDN'T WRITE ALL OF THE DISCOVERY MATERIAL.

ALSO, REGARDING THE BOP ASSESSMENT, THEY DO THEIR OWN ASSESSMENT. THEY DON'T JUST SOLELY TAKE INTO CONSIDERATION THE PSR WHEN THEY PROVIDE SERVICES TO INDIVIDUALS. HE'LL BE ABLE

1    TO REQUEST WHAT SERVICES HE WOULD WANT, AND THEY WILL ASSESS

2    THAT ON THEIR OWN TERMS.

3          WITH REGARDS TO THE FIREARM, IT WAS INCLUDED IN THE

4    OFFENSE CONDUCT BECAUSE IT'S A FACT.  IT WAS THERE.  WE DID NOT

5    ADDRESS IT IN ANY KIND OF GUIDELINE ENHANCEMENT, AND WE ALSO

6    ADDRESSED OUR ASSESSMENT OF THE GUN FURTHER INTO THE REPORT.

7          I BELIEVE THAT WAS THE THREE CONCERNS THAT WERE

8    ADDRESSED.

9          THE COURT:  NO, I BELIEVE YOU ADDRESSED THEM.

10          THE PROBATION OFFICER:  NOTHING FURTHER.

11          THE COURT:  THANK YOU VERY MUCH.

12          DID YOU HAVE SOMETHING YOU WISH TO SAY?  BECAUSE IF YOU

13    DO IT MUST BE LIMITED, IT MUST BE LIMITED TO ONE OR TWO

14    MINUTES, MA'AM, BECAUSE WE DO NEED TO FINISH THIS THIS MORNING

15    BECAUSE SO MANY PEOPLE ARE MISSING WORK AND SCHOOL TO BE HERE.

16          MS. MORGAN:  NO, YOUR HONOR.

17    (DISCUSSION HELD OFF THE RECORD.)

18          MS. MORGAN:  I GUESS -- NO, YOUR HONOR, I'M FINE.

19          THE COURT:  IF YOU AND MR. MCLEOD WOULD LIKE TO TAKE

20    THE PODIUM.

21          MS. MORGAN:  THE ONLY STATEMENT I WOULD LIKE TO MAKE IS

22    I DO REALIZE THAT THE BOP DOES MAKE THEIR OWN ASSESSMENT, BUT

23    IT IS TRUE WHEN A GUN APPEARS IN AN OFFENSE CONDUCT SECTION,

24    MR. MCLEOD DOESN'T GET TO EXPLAIN IT AND IT DOESN'T GO AWAY.

25          THE COURT:  WELL, NO, I UNDERSTAND THAT.

IT GOES WITHOUT SAYING THAT I'VE SPENT MORE HOURS THAN ANYBODY IN THIS COURTROOM COULD IMAGINE THINKING ABOUT THIS CASE, BUT I WOULD IMAGINE FOR THOSE OF YOU ON BOTH SIDES OF THIS CASE YOU HAVE DONE SIMILAR THINGS, AND I APPRECIATE EVERYBODY'S COMMENTS THAT IT'S NOT OVER. IT MAY NEVER BE OVER. THESE THINGS WILL STAY WITH YOU, AND THAT'S JUST THE REALITY OF THINGS.

LET ME START BY TALKING ABOUT THE OBJECTIONS. I STARTED AT THE OUTSET THIS MORNING WITH TELLING YOU MY FEELINGS ON THE OBJECTIONS. THAT PRELIMINARY STATEMENT NOW BECOMES THE COURT'S FINAL POSITION. I'M NOT GOING TO REQUEST THAT ANYTHING BE CHANGED IN THE PRESENTENCE REPORT. IN FACT, THE GUN WAS IN THE VEHICLE. THAT WAS A FACT, AND I THINK THAT NEEDS TO STAY IN THERE.

WHAT OCCURRED AT MCC I THINK NEEDS TO STAY IN THERE FOR A VARIETY OF REASONS, NOT THE LEAST OF WHICH IS THAT THE BUREAU OF THE PRISONS CONSIDERS SAFETY OF MR. MCLEOD IN PLACEMENT AND IN HOUSING.

WITH REGARD TO -- I'VE ALREADY STATED THE CONDITIONS ON SUPERVISED RELEASE, AND, IN FACT, THE DEFENSE IS THAT THAT COVERS MOST OF THEIR CONCERNS. I WILL GIVE ALL THE CONDITIONS I'VE INDICATED, AND I WILL GO THROUGH THOSE INDIVIDUALLY WITH YOU, MR. MCLEOD. I WILL GIVE THOSE OVER OBJECTION OF THE DEFENSE. I THINK THEY ARE RELATED. I THINK THEY ARE IMPORTANT, AND APPROPRIATELY INCLUDED IN A PERIOD OF SUPERVISED

1    RELEASE.

2         I HAVE MADE THE GUIDELINE CALCULATION.  I WENT THROUGH

3    GROUPS 1 THROUGH 8, GROUP 9, GROUP 10, AND INDICATING WHAT THAT

4    WAS.  I'VE ALSO MADE THE ALTERNATIVE GUIDELINE CALCULATION IN

5    THIS MATTER PRELIMINARILY AT THE FRONT END.  THOSE NOW BECOME

6    THE COURT'S CALCULATION IN THIS MATTER.

7         I WOULD SAY -- WELL, LET ME KEEP GOING HERE.

8    RESTITUTION WILL BE PUT OVER.

9         WITH REGARD TO THE SEXUAL CONDUCT ENHANCEMENT, I DO

10   FIND THAT THAT IS APPROPRIATELY APPLIED, AND I FIND THAT BY A

11   PREPONDERANCE OF THE EVIDENCE.

12        IN HAVING MADE BOTH GUIDELINE CALCULATIONS, I WOULD

13   INDICATE THAT THE APPROPRIATE SENTENCE IN THIS COURT'S MIND

14   LIES WITHIN THE SENTENCING RANGES THAT RESULT IN OVERLAP IN

15   THESE TWO CALCULATIONS.  NOW, I KNOW THAT'S NOT BINDING ON THIS

16   COURT, BUT IT'S SOMETHING THAT CAME OUT TO THE COURT IN LOOKING

17   AT THIS.

18        I HAVE SO MANY THINGS THAT I CONSIDERED, AND I'M

19   TALKING TO THOSE OF YOU WHO ARE HERE IN ATTENDANCE, COUNSEL

20   KNOWS THIS, MR. MCLEOD KNOWS THIS FROM LENGTHY CONVERSATIONS

21   I'M CERTAIN WITH HIS COUNSEL, BUT THAT I'M LOOKING FOR A

22   SENTENCE THAT'S SUFFICIENT BUT NOT GREATER THEN WHAT'S

23   NECESSARY.  AND IN A CASE LIKE THIS WHERE LIVES ARE IMPACTED

24   IRREPARABLY ON BOTH SIDES, BUT I'M THINKING MORE FROM THE

25   VICTIMS' SIDE AT THIS JUNCTURE, OF COURSE, IT'S HARD TO SAY,

1    WELL, HOW COULD ANYTHING BE TOO GREAT?  NONETHELESS, I HAVE TO

2    CONSIDER ALL THE REQUIREMENTS THAT THE LAW PLACES UPON ME.

3         A LOT OF THINGS HAVE BEEN SAID THIS MORNING, AND ONE

4    THING THAT WAS SAID WAS THAT THIS WAS AN ONLINE GAMING

5    RELATIONSHIP.  WELL, THIS WAS SO MUCH MORE THAN THAT.  THIS WAS

6    SOMETHING THAT BEGAN IN THAT FASHION, BUT THEN THERE WAS AN

7    OPPORTUNITY TAKEN BY MR. MCLEOD TO LEARN OF VULNERABILITIES, TO

8    PRY INTO LIVES AND TO TAKE ADVANTAGE AND EXPLOIT, IF YOU WILL,

9    THE WEAKNESSES THERE.

10        WE CAN'T REPLAY THIS CASE.  WE ALL HEARD IT.  EVERYBODY

11   IN THIS COURTROOM TOOK PART IN THOSE PROCEEDINGS, AND IT WAS

12   BASICALLY A TWO-WEEK TRIAL, SO IT WILL REMAIN FOREVER VIVID IN

13   MOST OF OUR MEMORIES AS TO WHAT OCCURRED, AND THE EXCHANGES

14   THAT TOOK PLACE, BUT THESE TWO VICTIMS WERE UNDERAGE.  THEY

15   WERE NOT ABLE TO CONSENT TO WHAT OCCURRED HERE, AND MR. MCLEOD

16   HAD EVERY OPPORTUNITY, AS THE COURT VIEWS THIS, TO MAKE A

17   BETTER DECISION.

18        IT WAS INTERESTING TODAY FOR ME TO HEAR JOHNATHAN

19   INDICATE THAT DESPITE WHAT'S HAPPENED TO HIM, HE DOES NOT WISH

20   TO PERPETRATE THIS TO ANOTHER GENERATION.  HE WOULD LIKE TO

21   WORK QUITE THE CONTRARY, TO HELPING PEOPLE.

22        WHILE I'M UNDERSTANDING OF THE UPBRINGING AND

23   EXPERIENCES YOU'VE HAD, MR. MCLEOD, I DON'T THINK THAT'S AN

24   EXCUSE OR IN ANY WAY EXPLAINS AWAY THIS CONDUCT BECAUSE QUITE

25   THE CONTRARY COULD OCCUR, YOU COULD SAY, "I NEVER WANT ANYBODY

1    ELSE TO EXPERIENCE THIS," AND NOT PREY UPON THE YOUNG PEOPLE

2    THAT YOU PREYED UPON, SIR, TO BE QUITE HONEST.

3         SO LET ME INDICATE THAT IF I'M INCLUDING THE

4    OVERLAPPING RANGES OF THE FIRST CALCULATION I MADE WITH THE

5    SECOND CALCULATION, I END UP WITH A GUIDELINE RANGE OF

6    324 MONTHS TO 327 MONTHS, AND THAT'S WHERE I AM AT THIS

7    JUNCTURE.

8         I ALSO HAVE TO LOOK AT THE 3553(A) FACTORS, AND FOR

9    THOSE OF YOU WHO ARE LISTENING AND OBSERVING TODAY, THAT'S THE

10   NATURE AND CIRCUMSTANCES OF THE OFFENSE.  IT'S THE

11   CHARACTERISTICS THAT MR. MCLEOD BRINGS BEFORE THE COURT.  IT'S

12   THE SERIOUSNESS OF THIS OFFENSE.  IT'S THE NEED TO PROMOTE

13   RESPECT FOR THE LAW.  IT'S THE NEED TO DETER SPECIFICALLY WITH

14   REGARD TO MR. MCLEOD AND GENERALLY WITH REGARD TO OTHERS WHO

15   ARE OBSERVERS OF OUR CRIMINAL JUSTICE SYSTEM.  THERE'S ALSO A

16   NEED TO AVOID SENTENCING DISPARITIES.

17        IN LOOKING AT ALL OF THOSE, ASSUMING I'M AT THE

18   OVERLAPPING GUIDELINE RANGE OF 324 TO 327, WHICH IS A SMALL

19   RANGE THAT THESE TWO CALCULATIONS OVERLAP, I AM INCLINED TO

20   NEITHER VARY DOWNWARD NOR VARY UPWARD IN THIS.  I DO BELIEVE

21   THAT THAT RANGE IS SUFFICIENT BUT NOT GREATER THAN WHAT IS

22   NECESSARY GIVEN THE RATHER HORRENDOUS FACTS OF THIS CASE.

23        MR. MCLEOD HAD MANY HOURS SITTING ON AN AIRPLANE,

24   COMING OUT TO CALIFORNIA, TO GET A HANDLE ON THE DECISIONS HE

25   WAS MAKING BEFORE HE PICKED UP JOHNATHAN AND TURNED AROUND AND

1    LEFT, SO OPPORTUNITY BY WAY OF TIME AND OTHER FACTORS WERE

2    PROVIDED TO HIM, AND IT DIDN'T OCCUR.

3         SO I'M GOING TO IMPOSE 324 MONTHS IN THE CUSTODY OF THE

4    BUREAU OF THE PRISONS.  THAT'S GOING TO BE ON -- HAVING GROUPED

5    THIS AND DONE THE CALCULATIONS I HAVE, I THINK I JUST IMPOSE

6    THAT ONCE, ALTHOUGH SOME OF YOU, AND I'M LOOKING TO COUNSEL

7    THAT HAVE EXPRESSED IT DIFFERENTLY, I THINK THAT'S THE CORRECT

8    WAY TO GO.

9         NOW, MR. MCLEOD, AFTER YOU'RE RELEASED FROM CUSTODY,

10   SIR, I DO BELIEVE A PERIOD OF SUPERVISION IS REQUIRED.  GIVEN

11   THE NATURE OF THIS CASE, AND ALL THE FACTS THAT SURROUND IT,

12   SIR, AND EVERYTHING THAT I KNOW, I'M GOING TO IMPOSE A PERIOD

13   OF SUPERVISION THAT WILL BE FOR THE REST OF YOUR LIFE, SIR.  I

14   THINK THAT WILL PROVIDE THE STRUCTURE THAT WILL BE NECESSARY

15   FOR YOU TO BE LAW-ABIDING IN ALL RESPECTS WHEN YOU ARE RELEASED

16   FROM CUSTODY.

17        DURING THAT PERIOD OF SUPERVISION, MR. MCLEOD, YOU'RE

18   NOT TO VIOLATE ANY LAWS.  YOU MUST BE LAW-ABIDING IN ALL

19   RESPECTS OR YOU COULD BE BROUGHT BACK BEFORE THE COURT AND YOU

20   COULD SERVE ADDITIONAL TIME IN CUSTODY.

21        THE FOLLOWING SPECIAL CONDITIONS APPLY, AND I'M GOING

22   THROUGH -- IF YOU HAVE IT HANDY FOR YOUR REFERENCE AND MR.

23   MCLEOD'S REFERENCE, I'M GOING THROUGH THE PRESENTENCE REPORT

24   CONDITIONS THAT I'VE MODIFIED STARTING ON PAGE 32.

25        THE FIRST IS THAT YOU SUBMIT YOUR PERSON, YOUR

1    PROPERTY, YOUR HOUSE, YOUR RESIDENCE, YOUR VEHICLE, YOUR

2    PAPERS, YOUR COMPUTER, ELECTRONIC COMMUNICATIONS OR DATA

3    STORAGE MEDIA AND EFFECTS TO A SEARCH AT ANY TIME WITH OR

4    WITHOUT A WARRANT BY ANY LAW ENFORCEMENT OR PROBATION OFFICER

5    WITH REASONABLE SUSPICION CONCERNING A VIOLATION OF A CONDITION

6    OF YOUR SUPERVISED RELEASE OR UNLAWFUL CONDUCT, AND OTHERWISE

7    IN THE LAWFUL DISCHARGE OF THE OFFICER'S DUTIES.  THIS IS

8    PURSUANT TO 18 USC SECTIONS 3563(B)(23) AND 3583(D)(3).

9         SECOND CONDITION, CONSENT TO THIRD-PARTY DISCLOSURE TO

10   ANY EMPLOYER, POTENTIAL EMPLOYER CONCERNING ANY RESTRICTIONS

11   THAT ARE IMPOSED BY THE COURT.

12        THIRD CONDITION, NOT USE OR POSSESS DEVICES WHICH CAN

13   COMMUNICATE DATA VIA MODEM OR DEDICATED CONNECTION, AND MAY NOT

14   HAVE ACCESS TO THE INTERNET WITHOUT PRIOR APPROVAL FROM THE

15   COURT OR THE PROBATION OFFICER.  YOU WILL CONSENT TO THE

16   INSTALLATION OF SYSTEMS THAT WILL ENABLE PROBATION TO MONITOR

17   COMPUTER USE ON ANY COMPUTER OWNED OR CONTROLLED BY YOU, AND

18   YOU WILL PAY FOR THE COST AND INSTALLATION OF THE COMPUTER

19   SOFTWARE.

20        FOURTH CONDITION, NOT ASSOCIATE WITH OR HAVE ANY

21   CONTACT WITH ANY SEX OFFENDERS, UNLESS IN AN APPROVED TREATMENT

22   OR COUNSELING SETTING.

23        FIFTH CONDITION, NOT HAVE CONTACT WITH ANY CHILD UNDER

24   THE AGE OF 18 UNLESS IN THE PRESENCE OF A SUPERVISING ADULT WHO

25   IS AWARE OF YOUR DEVIANT SEXUAL BEHAVIOR AND CONVICTION, AND

WITH THE PRIOR APPROVAL OF PROBATION.

SIXTH CONDITION, NOT ACCEPT OR COMMENCE EMPLOYMENT OR VOLUNTEER ACTIVITY WITHOUT PRIOR APPROVAL OF THE PROBATION OFFICER, AND EMPLOYMENT SHOULD BE SUBJECT TO CONTINUOUS REVIEW AND ASSESSMENT BY THE PROBATION OFFICER.

SEVEN, NOT LOITER WITHIN 200 YARDS OF A SCHOOL, SCHOOLYARD, PLAYGROUND, PARK, AMUSEMENT CENTER OR PARK, PUBLIC SWIMMING POOL, ARCADE, DAYCARE CENTER, CARNIVAL, RECREATION VENUE, LIBRARY, AND OTHER PLACES PRIMARILY FREQUENTED BY PERSONS UNDER THE AGE OF 18 WITHOUT PRIOR APPROVAL OF PROBATION.

EIGHTH CONDITION, NOT POSSESS ANY MATERIALS, SUCH AS VIDEOS, MAGAZINES, PHOTOGRAPHS, COMPUTER IMAGES, OR OTHER MATTER THAT DEPICTS SEXUALLY-EXPLICIT CONDUCT INVOLVING CHILDREN AND/OR ADULTS, AS DEFINED BY 18 USC 2256(2), AND ACTUAL SEXUALLY-EXPLICIT CONDUCT INVOLVING ADULTS AS DEPICTED IN 18 USC 2257(H)(1), AND NOT PATRONIZE ANYPLACE WHERE SUCH MATERIALS OR ENTERTAINMENT ARE THE PRIMARY MATERIAL AVAILABLE.

THE NINTH CONDITION IS COMPLETE A SEX OFFENDER EVALUATION, WHICH MAY INCLUDE PERIODIC PSYCHOLOGICAL AND PHYSIOLOGICAL TESTING, WITH THE EXCEPTION OF PENILE PLETHYSMOGRAPHY TESTING AND COMPLETION OF THE ABLE ASSESSMENT AT THE DIRECTION OF THE COURT OR PROBATION.  AND YOU'RE TO PARTICIPATE AND SUCCESSFULLY COMPLETE A STATE CERTIFIED SEX OFFENDER TREATMENT PROGRAM, INCLUDING COMPLIANCE WITH TREATMENT

1  REQUIREMENTS OF THE PROGRAM.  YOU WILL PERMIT THE RELEASE OF

2  RECIPROCAL INFORMATION BETWEEN PROBATION AND THE TREATMENT

3  PROVIDER.  YOU MAY BE REQUIRED TO, MR. MCLEOD, TO CONTRIBUTE TO

4  THE COST OF THESE SERVICES, IF YOU HAVE THE ABILITY TO DO SO.

5          TENTH CONDITION, RESIDE IN A RESIDENCE APPROVED IN

6  ADVANCE BY PROBATION, AND ANY CHANGES IN RESIDENCE MUST BE

7  PREAPPROVED BY PROBATION.

8          ELEVENTH CONDITION, BE MONITORED WHILE UNDER

9  SUPERVISION WITH LOCATION MONITORING TECHNOLOGY AT THE

10  DISCRETION OF THE PROBATION OFFICER, WHICH SHALL BE UTILIZED

11  FOR THE PURPOSES OF VERIFYING COMPLIANCE WITH ANY COURT-IMPOSED

12  CONDITION OF SUPERVISION.  AGAIN, MR. MCLEOD, YOU MAY PAY FOR

13  ALL OR PART OF THIS COST OF MONITORING BASED ON YOUR ABILITY TO

14  DO SO.

15          TWELFTH CONDITION, NOT HAVE ANY CONTACT, DIRECT OR

16  INDIRECT, EITHER TELEPHONICALLY, VISUALLY, VERBALLY OR THROUGH

17  WRITTEN MATERIAL OR THROUGH ANY THIRD-PARTY COMMUNICATION WITH

18  THE VICTIMS OR VICTIMS' FAMILY IN THIS CASE WITHOUT PRIOR

19  APPROVAL OF PROBATION.

20          I AM NOT GOING TO IMPOSE A FINE IN THIS CASE.  I AM

21  GOING TO IMPOSE THE $1,100 PENALTY ASSESSMENT -- OR SPECIAL

22  ASSESSMENT IN THIS MATTER.  THAT CAN BE WORKED OFF, MR. MCLEOD,

23  WHILE YOU'RE IN CUSTODY.

24          I WILL REQUEST DESIGNATION AS CLOSE TO THE STATE OF

25  FLORIDA OR IN THE STATE OF FLORIDA, PER THE DEFENDANT'S

REQUEST, PROVIDED THAT THERE'S A FACILITY THERE THAT HAS THE
APPROPRIATE PROGRAMS.

YOU'VE PROBABLY LOOKED INTO THAT AND THEY DO?

MS. MORGAN:  YES, THERE IS, YOUR HONOR.  I USED MY
PHONE.

THE COURT:  RESTITUTION HAS YET TO BE DETERMINED, AND
SO WE NEED TO SET A HEARING DATE FOR THAT.

BEFORE WE GET TO THAT, I KNOW WE HAVEN'T DONE
RESTITUTION, BUT THERE WAS A TRIAL AND YOU DO HAVE THE RIGHT TO
APPEAL, MR. MCLEOD, FROM THE ORDERS OF THIS COURT, FROM THE
JUDGMENT OF GUILT IN THE CASE, AND FROM THE SENTENCE THAT I
JUST IMPOSED.

YOU HAVE THE RIGHT TO HAVE A LAWYER REPRESENT YOU ON
THIS APPEAL, AND IF YOU CANNOT AFFORD A LAWYER, ONE WILL BE
APPOINTED FOR YOU.

IF YOU CANNOT AFFORD THE CERTIFIED COPIES OF THE
NECESSARY RECORDS AND TRANSCRIPTS FOR APPEAL, THEY WILL BE
FURNISHED AT THE EXPENSE OF THE UNITED STATES GOVERNMENT.  IF
YOU DO APPEAL, YOU MUST DO SO WITHIN 14 DAYS FROM TODAY.  IF
YOU DON'T APPEAL WITHIN THAT TIME FRAME, MR. MCLEOD, YOU LOSE
YOUR RIGHT TO APPEAL.

DO YOU UNDERSTAND THAT, SIR?

THE DEFENDANT:  YES, MA'AM.

THE COURT:  DO THE PARTIES WANT TO CONFER AND TELL ME A
DATE HOW FAR OUT TO GO FOR A HEARING DATE ON RESTITUTION?  I

1    WON'T SET IT FOR A FULL HEARING.  PERHAPS THERE WILL BE

2    SOMETHING THAT WILL BE AGREED UPON, I DON'T KNOW.

3         MS. MORGAN:  MS. KAISER INDICATES SHE'S GOING TO NEED

4    THE FULL 45 DAYS BECAUSE OF THE PRODUCTION OF RECORDS.  MS.

5    RAMIREZ NEEDS TO GET SOME RECORDS, SO ANY DATE AT THE END OF

6    FEBRUARY IS FINE WITH ME OR MAYBE THE FIRST WEEK IN MARCH,

7    WHATEVER THE COURT HAS AVAILABLE.

8         THE COURT:  HOW ABOUT I PUT IT ON A FRIDAY CALENDAR,

9    SEE WHAT WE'RE DEALING WITH.  IF WE NEED MORE TIME THAN I WOULD

10   HAVE ON A FRIDAY CALENDAR, LET ME KNOW.

11        MS. MORGAN:  I THINK THAT'S FINE, YOUR HONOR.  I DON'T

12   EXPECT IT WILL BE A LENGTHY HEARING.

13        THE COURT:  I DON'T DO HEARINGS ON FRIDAY.  SO IF WE

14   NEED TO SET IT FOR A HEARING, WE COULD MOVE IT FROM THAT

15   FRIDAY, IF YOU JOINTLY FILE SOMETHING AND LET ME KNOW IN

16   ADVANCE.

17        MS. KAISER:  YOUR HONOR, THAT FRIDAY IS FINE.  MS.

18   MORGAN AND I HAVE AN OPEN LINE OF COMMUNICATION, SO IF WE DO

19   THINK THERE'S GOING TO BE A HEARING NEEDED, WE'LL INFORM MR.

20   RAMOS.

21        THE COURT:  VERY WELL.  PICK A DATE THE END OF

22   FEBRUARY, ALEX, IF WE CAN DO IT THEN.

23        THE CLERK:  FEBRUARY 26TH AT 9:00 A.M.

24        MS. MORGAN:  THAT'S FINE.

25        THE COURT:  WHEN WE GROUP THE COUNTS, DO WE STILL

1    IMPOSE CONCURRENTLY ON EVERY COUNT?

2         MS. MORGAN:  YES, YOUR HONOR.

3         THE COURT:  SO I'M GOING TO RUN THIS CONCURRENT ON ALL

4    COUNTS.  I KNOW THE GOVERNMENT BROKE THEIR SENTENCING DOWN, YOU

5    DID NOT, PROBATION DID NOT, I DID NOT, BUT ON ALL THE COUNTS

6    THAT ARE BEFORE THE COURT, I WILL IMPOSE THAT SENTENCE ON EACH

7    COUNT TO RUN CONCURRENTLY, LIFE SUPERVISION ON ALL COUNTS TO

8    RUN CONCURRENTLY.

9         MR. MCLEOD, WE'RE NOW GOING TO HAND YOU COPIES OF THE

10   CONDITIONS THAT THE COURT IMPOSED.  THAT'S IMPORTANT PAPERWORK,

11   SIR, FOR YOU TO KEEP FOR YOUR REFERENCE.

12        IS THERE ANYTHING ELSE, MS. MORGAN, MS. KAISER,

13   PROBATION?

14        MS. MORGAN:  YOUR HONOR, I JUST NEED TO PERFECT MY

15   RECORD FOR APPEAL.  WE DO OBJECT TO BOTH THE SUBSTANTIVE AND

16   THE PROCEDURAL REASONABLENESS OF MR. MCLEOD'S SENTENCING.  OUR

17   PROCEDURAL GROUNDS ARE BASED ON THE DENIAL OF OUR OBJECTIONS TO

18   THE PRESENTENCE REPORT THAT THE COURT PREVIOUSLY RULED ON, AND

19   OBVIOUSLY WE ARE ALSO OBJECTING TO THE SUBSTANTIAL -- THE

20   SUBSTANTIVE REASONABLENESS OF THE SENTENCE.

21        THE COURT:  ANYTHING YOU WANT TO SAY WITH REGARD TO

22   THAT, MS. KAISER?

23        MS. KAISER:  YOUR HONOR HAS INDICATED YOUR HONOR HAS

24   READ AND CONSIDERED ALL THE FILINGS, AND THIS HAS BEEN A VERY

25   LONG HEARING, AND YOUR HONOR HAS PAINSTAKINGLY GONE THROUGH ALL

1    OF THIS, SO WE THANK YOUR HONOR FOR YOUR TIME AND

2    CONSIDERATION.

3         THE COURT:  THANK YOU.  THANK YOU TO EVERYBODY WHO CAME

4    THIS MORNING.

5    (THE HEARING CONCLUDED.)

6

7

8

9

10

11                    C E R T I F I C A T E

12

13        I, GAYLE WAKEFIELD, CERTIFY THAT I AM A DULY
     QUALIFIED AND ACTING OFFICIAL COURT REPORTER FOR THE UNITED
14   STATES DISTRICT COURT, THAT THE FOREGOING IS A TRUE AND
     ACCURATE TRANSCRIPT OF THE PROCEEDINGS AS TAKEN BY ME IN THE
15   ABOVE-ENTITLED MATTER ON JANUARY 6, 2016; AND THAT THE FORMAT
     USED COMPLIES WITH THE RULES AND REQUIREMENTS OF THE UNITED
16   STATES JUDICIAL CONFERENCE.

17

18   DATED:  FEBRUARY 22, 2016     /S/ GAYLE WAKEFIELD_____
                                   GAYLE WAKEFIELD, RPR, CRR
19                                 OFFICIAL COURT REPORTER

20

21

22

23

24

25